THE STATE EX REL. LAWSON, APPELLANT, *v.* MONDIE FORGE ET AL., APPELLEES.

[Cite as *State ex rel. Lawson v. Mondie Forge,*
104 Ohio St.3d 39, 2004-Ohio-6086.]

(No. 2003–1992—Submitted August 17, 2004—Decided December 1, 2004.)

**Per Curiam.**

{¶ 1} Throughout his working career, appellant-claimant, Donald E. Lawson, did heavy labor. During much of this time, claimant was also a council member for the village of West Elkton, Ohio, a community of approximately 270 people.

{¶ 2} In 1985, claimant's allowed workers' compensation conditions of lumbosacral strain, herniated disc L4–5, and mild depression forced him from the labor market. Claimant was awarded permanent total disability compensation ("PTD") effective in 1994, after appellee Industrial Commission of Ohio concluded that the low-stress sedentary jobs to which claimant's conditions limited him were foreclosed to anyone with his lack of skills and education.

{¶ 3} In 2001, for reasons not specified, appellee Bureau of Workers' Compensation reopened claimant's case. The ensuing investigation produced written and recorded evidence that became the cornerstone of the bureau's efforts to terminate PTD.

{¶ 4} The most extensive documentation was an "activity spreadsheet" that contained 207 activities engaged in by the claimant from 1993 through 2001, almost all allegedly for the benefit of the village. The predominant activity listed was refuse disposal, which will be explained more fully below. Each year, claimant also put up flags in village streets for July 4th, Labor Day, and Memorial Day. Other miscellaneous activities included plowing snow, purchasing hardware and gas, unspecified truck and plow maintenance, and hauling gravel. The parties agree that claimant did almost all of this work for free, receiving from the village a salary of at most $200 to $300 per year for his council activities plus a bonus amounting to $6 per hour for plowing.

{¶ 5} The second piece of evidence was a surveillance videotape and accompanying surveillance log. According to the log, the tape covered a total of about five and a half hours over two consecutive Saturdays during the annual village clean-up.[1] Most of the documented activity involved driving a dump truck and loading unspecified items into the truck. Log entries stated that claimant had helped load a couch and a lawn mower onto the truck's bed. Another stated that claimant "kicked and broke apart a table." He allegedly hoisted a chair of unknown description and weight, but left the lifting of an appliance to others. Again, remuneration, if any, was part of the minimal compensation mentioned earlier.

{¶ 6} The final piece of evidence consisted of affidavits from three village residents, including the mayor and police chief. Much of their testimony repeated that of the spreadsheet. There was also evidence that claimant occasionally did some lawn mowing with both a push and riding mower.

{¶ 7} This surveillance evidence was given to Dr. David R. Dunkin to review. He concluded:

{¶ 8} "Claimant has been well documented through both still photos and videorecordings performing activities which far exceeded restrictions of activity which were the grounds for granting permanent and total disability, i.e. restrictions of lifting no greater than 10 pounds, repeated bending or lifting objects below the level of the knee, repeated rotary movement of the lumbar spine and lifting objects above the level of the shoulders. Violation[s] of all these restrictions have been documented and are not consistent with the injured worker being permanently and totally disabled based upon these restrictions."

{¶ 9} The bureau responded with a three-part motion that asked the commission to (1) terminate further PTD, (2) declare all prior PTD to be overpaid, and (3) issue a declaration of fraud. A staff hearing officer ("SHO") declined:

{¶ 10} "The claimant, although sitting on the Village Council, sporadically shoveling snow and mowing lawns for friends and neighbors, driving a maximum of 2½ to 7 miles a day, and accepting between $200.00 to $300.00 a year from the City of West Elkton for such services, has not been engaged in sustained remunerative employment and therefore has not committed any fraudulent activity which would warrant a finding of fraud or an overpayment of permanent total disability benefits."

{¶ 11} The bureau appealed, arguing that the SHO's analysis was fatally flawed. It cited the SHO's failure to determine whether the activities established

---

1. The videotape in the record is only 20 minutes long and of poor quality. It showed three men, without specifying which one was claimant. Overall, it showed very little.

a *capacity* for sustained remunerative employment and urged reconsideration. The commission granted reconsideration and, ultimately, the bureau's motion:

{¶ 12} "It is the finding of the Industrial Commission that the injured worker has been engaged in physical activity since 1993 which demonstrates that he is capable of performing sustained remunerative employment. In reaching this decision, the Commission relies upon the evidence submitted with the Administrator's motion, including, but not limited to, the affidavits and videotape evidence. This evidence substantiates a regular pattern of work activity over the past nine years, some of which was physical activity well in excess of the sedentary restrictions relied on in the decision to grant the injured worker's permanent total disability application. The Commission further relies on the report of Dr. Dunkin, dated 08/27/2001, in support of this finding."

{¶ 13} The commission also made a declaration of fraud.

{¶ 14} Claimant filed a complaint in mandamus in the Court of Appeals for Franklin County. The court of appeals found evidence supporting the commission's order and denied the writ, prompting claimant's current appeal.

{¶ 15} Three questions are posed directly: Did the commission abuse its discretion in (1) terminating PTD, (2) declaring overpaid all PTD after May 14, 1994, and (3) finding that claimant committed fraud? Cumulatively, they invoke a critical issue that has always lurked in the periphery of the PTD debate: How active can a person be and still be deemed eligible for PTD?

{¶ 16} PTD pivots on a single question: Is the claimant *capable* of sustained remunerative employment? *State ex rel. Stephenson v. Indus. Comm.* (1987), 31 Ohio St.3d 167, 31 OBR 369, 509 N.E.2d 946. Payment of PTD is inappropriate where there is evidence of (1) actual sustained remunerative employment, *State ex rel. Kirby v. Indus. Comm.*, 97 Ohio St.3d 427, 2002-Ohio-6668, 780 N.E.2d 275; (2) the physical ability to do sustained remunerative employment, *State ex rel. Schultz v. Indus. Comm.*, 96 Ohio St.3d 27, 2002-Ohio-3316, 770 N.E.2d 576; or (3) activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award. See *State ex rel. Timmerman Truss, Inc. v. Indus. Comm.*, 102 Ohio St.3d 244, 2004-Ohio-2589, 809 N.E.2d 15, ¶ 26.

{¶ 17} The first criterion is the cleanest. Nothing demonstrates capacity better than actual performance. No speculation or residual doubt is involved. Unfortunately, that is not always the case where the other two criteria are involved, and it is not the case here. Ultimately, our review persuades us that the evidence is insufficient to support the commission's decision, and, for this reason, we reverse the judgment of the court of appeals and order reinstatement of PTD.

{¶ 18} The commission declined to classify claimant's activities as remunerative, characterizing them instead as *potentially* remunerative and medically inconsistent with his allegation of PTD. It based this conclusion on what it deemed to be a "regular pattern of work activity." This denomination of claimant's activities as both a pattern—i.e., sustained—and as work, however, invites scrutiny. See *Kirby*, 97 Ohio St.3d 427, 2002-Ohio-6668, 780 N.E.2d 275, at ¶ 10.

{¶ 19} Neither "sustained" nor "work" has been conclusively defined for workers' compensation purposes. As to the latter, clearly, labor exchanged for pay is work. *Schultz* also teaches that unpaid activity that is potentially remunerative can be considered for purposes of establishing a physical capacity for remunerative employment. This principle, however, should always be thoughtfully approached, particularly when PTD is at issue.

{¶ 20} One of the most enduring (though not often explicitly stated) misconceptions about PTD is that once it is granted, the recipient must thereafter remain virtually housebound. This is a fallacy. PTD exempts no one from life's daily demands. Groceries must be purchased and meals cooked. Errands must be run and appointments kept. The yard must be tended and the dog walked. Where children are involved, there may be significant chauffeur time. For some, family and friends shoulder much of the burden. Others, on the other hand, lack such support, leaving the onus of these chores on the PTD claimant.

{¶ 21} These simple activities can nevertheless often generate considerable controversy. That is because all of these tasks are potentially remunerative. From the school cafeteria to the four-star restaurant, people are paid to prepare meals. People are paid for lawn and child care. Many people earn their living behind the wheel. *State ex rel. Parma Comm. Gen. Hosp. v. Jankowski*, 95 Ohio St.3d 340, 2002-Ohio-2336, 767 N.E.2d 1143, acknowledged this and cautioned against an automatic disqualification from compensation based on the performance of routine tasks, regardless of their potential for payment. We instead compared the activities with claimant's medical restrictions to determine whether they were so inconsistent as to impeach the medical evidence underlying the disability award.

{¶ 22} In the case at bar, the commission relied on physical restrictions limiting claimant to sedentary work without repetitive bending or lifting, and noted that "some" of claimant's activities exceeded these limitations. While that is true, isolating these incidents conflicts with *State ex rel. Vanover v. Emery Worldwide* (1997), 80 Ohio St.3d 367, 686 N.E.2d 518. There, the commission, in addressing an application for wage-loss compensation, invalidated a substantial job search, half of which involved jobs beyond claimant's vocational qualifications. We found an abuse of discretion:

{¶ 23} "The problem, in our eyes, with invalidating the entire search on this basis, however, is that it ignores the number of legitimate contacts that claimant did make. If half the total contacts are bad, then half of them are good, and, in this case, half of the total is substantial." Id. at 369, 686 N.E.2d 518.

{¶ 24} This prohibition against viewing activities out of context applies even more forcefully here. Some of the randomly logged activities were beyond claimant's restrictions. The *vast* majority of the cited activities, however, were not. Claimant's 1993 through 2001 activity spreadsheet has 207 confirmed activities, *none* of which contains sufficient information to conclusively establish that *any* of them conflicted with claimant's restrictions.

{¶ 25} The predominant activity listed on the spreadsheet, for example, is refuse disposal, but there is no evidence that claimant did anything other than drive a truck—an activity within claimant's sedentary limitations. There was no proof contradicting claimant's testimony that others loaded the truck, nor is there evidence indicating the weight and contents thereof. Only the video surveillance log—and supposedly the full tape—demonstrates that claimant did some lifting, and while some of that lifting exceeded claimant's restrictions, most of it did not. Only claimant's assistance in lifting a mower and a couch could conclusively be said to exceed his medical limitations. The balance of the log entries listed miscellaneous debris of unspecified weight or objects expressly denominated as small.

{¶ 26} Evidence of other activities is similarly deficient. Three times a year claimant put up flags for federal holidays. No one has alleged more than light exertion. Other activities included driving a snowplow, buying hardware or gas, hauling gravel, and even buying an unspecified six-pack. None of these entries demonstrates work beyond sedentary.

{¶ 27} These, of course, are just the spreadsheet activities. There was also the videotape, the surveillance log, and resident affidavits. This evidence does show some activity inconsistent with claimant's medical restrictions, as is apparent from both the log and from Dr. Dunkin's report. That activity, however, is irrelevant absent evidence that claimant could do it on a sustained basis, and, on this point, the commission's position again fails.

{¶ 28} Dr. Dunkin's report derived from evidence documenting claimant's activities on two days, and establishes only that on those two days claimant engaged in some physical activity inconsistent with his medical restrictions. That does not equate to establishing claimant's ability to do so on a *sustained* basis, nor can that ability be inferred from the other evidence, most notably the spreadsheet. *If* the spreadsheet contained sufficient explanation of claimant's activities from 1993 to 2001 to conclude that claimant's actions then were comparable to those seen in the videotape, then certainly the commission's case

would be stronger. Even then, however, it would not be enough to establish sustained conduct or capabilities.

{¶ 29} The prevailing spreadsheet activity is refuse disposal. As the evidence shows, however, months passed without any record of claimant hauling trash. Other periods recorded only minimal activity. Between June 30, 1997, and March 30, 1998, for example, claimant made only five trips to the landfill. The same is true from July 31, 2000, to March 1, 2001, and May 31, 1996, to November 30, 1996. Of 71 months recorded, only five saw more than four trips in any given month. Evidence regarding claimant's other activities is even more scant. He plowed snow three times between 1994 and 2001. He purchased gas 12 times during these years and 12 times hauled gravel.

{¶ 30} In *State ex rel. Midmark Corp. v. Indus. Comm.* (1997), 78 Ohio St.3d 2, 676 N.E.2d 73, the employer challenged claimant's PTD application with surveillance evidence of claimant walking unassisted, raking leaves, and doing minor house repairs. The commission was not persuaded by Midmark's evidence and ordered PTD. The case eventually came before this court, which upheld the commission:

{¶ 31} "First, the [surveillance] material does not establish a medical capacity for work greater than sedentary. It simply shows claimant walking unassisted or doing fairly unstrenuous domestic chores. * * *

{¶ 32} "Second, these documented activities, even if deemed inconsistent and work-amenable, do not establish that claimant can do *sustained* remunerative employment. Midmark's investigation spanned approximately fifteen months, yet it could show only five days in which claimant was performing allegedly questionable activities. There is no evidence of claimant's performing even any medium-exertion labor, nor is there any evidence of claimant's doing the recorded activity on anything other than rare occasions. The surveillance package, therefore, proved very little." (Emphasis sic.) Id. at 11, 676 N.E.2d 73.

{¶ 33} As in *Midmark*, the present claimant's spreadsheet records establish—when viewed over eight years—only irregular activity. When coupled with the absence of any evidence indicating that these spreadsheet activities exceeded claimant's physical limitations, the commission's conclusion is even more hollow.

{¶ 34} Unquestionably, the commission has substantial leeway in both interpreting and drawing inferences from the evidence before it. This is especially relevant in surveillance situations where financial and privacy concerns generally prevent the extensive weeks- or months-long surveillance that could produce irrefutable evidence of sustained prohibited activity. This evidentiary latitude, on the other hand, is not unlimited and, in this case, does not permit the conclusion that claimant's actions constituted a pattern of sustained behavior. It also does

not permit the conclusion that claimant engaged in significant activity inconsistent with his medical restrictions.

{¶ 35} In the end, no one wishes to discourage the commission's vigorous investigation and prosecution of PTD cases in which evidence eventually shows that the claimant has received or is receiving benefits to which he is not entitled. The evidence in this case, however, does not support a cessation of compensation or a declaration of fraud. We therefore reverse the judgment of the court of appeals and order the commission to reinstate PTD and vacate its declaration of fraud.

Judgment reversed
and writ granted.

Moyer, C.J., Resnick, F.E. Sweeney, Pfeifer and O'Connor, JJ., concur.

Lundberg Stratton and O'Donnell, JJ., dissent.

---

**O'Donnell, J., dissenting.**

{¶ 36} The majority has concluded that the court of appeals erred in its decision to affirm the Industrial Commission's termination of Donald Lawson's permanent total disability ("PTD") benefits. The proper legal test to be applied in reviewing cases of this distinction is whether the record "contains some evidence which supports the commission's factual findings." *State ex rel. Fiber-Lite Corp. v. Indus. Comm.* (1988), 36 Ohio St.3d 202, 522 N.E.2d 548, syllabus. Upon review, I would assert that the record before us does contain some evidence supporting the commission's findings. Accordingly, I respectfully dissent from the decision reached by the majority and would affirm the decision of the court of appeals.

{¶ 37} The record here reveals that Lawson received PTD compensation in 1995 for a lumbosacral strain, mild depression, and a herniated disc at L4–5, which resulted from a lower-back injury in 1975 while working for Mondie Forge. The Industrial Commission made the award after finding that Lawson's limited education, lack of transferable work skills, and medical restrictions precluded him from sustaining remunerative employment. In its award of PTD, the Industrial Commission utilized the opinion of Dr. Jeffrey L. Mikutis, an orthopedic surgeon who examined Lawson. Mikutis opined that the claimant "would be expected to have difficulty in jobs lifting greater than 10 lbs, repeated bending, lifting objects from below the level of the knee, repeated rotary movements of the lumbar spine, [and] lifting objects above the level of the shoulders. * * * Walking greater than 10 to 15 minutes at a time or standing greater than this time would be likely to aggravate his discomfort."

{¶ 38} The Bureau of Workers' Compensation reopened Lawson's case in 2001, and a staff hearing officer ("SHO") examined evidence offered to refute Lawson's PTD status consisting of a videotape, still photographs, numerous affidavits, documents, and an opinion of a medical expert. Investigators for the bureau demonstrated that Lawson had engaged in varied moderate physical activities between 1993 and 2001. The SHO determined that Lawson had "not been engaged in sustained remunerative employment." The commission, however, vacated that order and determined that the SHO had made an error of law and had applied an incorrect legal standard. The commission therefore terminated PTD, declared all payments since May 14, 1994, to be overpayments, and determined that Lawson fraudulently obtained the PTD award. Lawson sought a writ of mandamus from the Tenth District Court of Appeals, compelling the commission to vacate its order and to reinstate his PTD. The court, however, denied the writ.

{¶ 39} To obtain a writ of mandamus, a relator must show a clear legal right to the relief requested and a clear legal duty on the part of the commission to provide the relief. *State ex rel. Hughes v. Goodyear Tire & Rubber Co.* (1986), 26 Ohio St.3d 71, 73, 26 OBR 61, 498 N.E.2d 459. "To show the clear legal right, relator must demonstrate that the commission abused its discretion by entering an order unsupported by some evidence in the record." Id. When the record contains some evidence to support the commission's factual findings, a court may not disturb the commission's findings in mandamus. *State ex rel. Fiber–Lite*, 36 Ohio St.3d 202, 522 N.E.2d 548, syllabus. Furthermore, the commission alone has the responsibility of assessing evidentiary weight and credibility. *State ex rel. Burley v. Coil Packing, Inc.* (1987), 31 Ohio St.3d 18, 20–21, 31 OBR 70, 508 N.E.2d 936.

{¶ 40} In light of this standard of review, I would assert that the record contains more than "some evidence" to support the commission's factual findings. In fact, this record is replete with evidence that supports the commission's decision to terminate Lawson's PTD because he is capable of sustained remunerative employment.

{¶ 41} An investigator for the Bureau of Workers' Compensation prepared a video showing Lawson and another person lifting a full-sized couch and loading it into the back of a dump truck during the West Elkton village clean-up day on April 28, 2001. Lawson lifted the couch above his head to get it over the sides of the dump truck, which stood six feet off the ground. After helping to hoist the couch into the truck bed, Lawson climbed into the bed, without displaying any pain or discomfort, and repositioned the couch with the help of another man. The video log and tape show Lawson repeatedly bending down to the ground to

pick up pieces of debris of various weights and sizes, and then loading or hurling them into the back of the dump truck.

{¶ 42} After taping these activities, the bureau retained the services of Dr. David R. Dunkin, who reviewed Lawson's file and the tape and observed that Lawson, over a two-hour period on April 28, 2001, loaded a broken eight-foot-long wooden table, a lawnmower, and a steel deck chair by hoisting the items over the side of the dump truck. Dunkin also reviewed videotape from May 5, 2001, showing Lawson "throwing a rope across a load of trash in the same truck and tightening it down to secure the load."

{¶ 43} In his report, Dunkin opined that the documented acts exceeded Lawson's medical restrictions in the PTD award. Lawson was "picking up items which far exceeded his 10 pound weight limit from the ground which also exceeded restrictions for repeated bending, twisting and lifting items below the level of his knee."

{¶ 44} Dunkin concluded that Lawson had been documented "performing activities which far exceeded restrictions of activity which were the grounds for granting permanent and total disability * * * [and were] not consistent with the injured worker being permanently and totally disabled."

{¶ 45} Despite the videotape and Dunkin's opinion, the majority disputes the Industrial Commission's findings because only some of Lawson's acts exceeded his PTD restrictions. However, the law only requires "some" evidence to support the commission's findings awarding or revoking PTD, and the record here contains more than just a videotape to support the commission's decision. For instance, the bureau presented three affidavits from other townspeople who stated that Lawson frequently performed physical work, in addition to the videotaped activities during the village clean-up, all seemingly beyond his restrictions.

{¶ 46} For example, Charles Pennington, Mayor of West Elkton, stated that Lawson frequently helped load West Elkton's dump truck with refuse. Pennington stated, "I have seen Lawson assist in loading the dump truck and he is the only person that takes the loads to the landfill." Jerry Combs, Chief of the West Elkton Police Department, corroborated Pennington's statement that Lawson loaded the truck on several occasions. "I have seen Lawson load and assist in loading the dump truck and haul the load to the landfill."

{¶ 47} The "activity spreadsheet" created as result of the bureau's investigation reveals that Lawson's refuse loading, collection, and dumping were not isolated incidents. While the majority cites several six- or eight-month time periods in which Lawson made only five trips to the landfill, a closer examination reveals that Lawson made 17 such trips in 1995—the year in which the commission awarded PTD—19 trips in 1996, 23 trips in 1997, 21 trips in 1998, 23 trips in 1999,

18 trips in 2000, and 9 trips in the first half of 2001. The bureau not only logged these trips on the spreadsheet but also corroborated them by invoices or load tickets from the Preble County landfill. This evidence suggests a pattern of activity that appears to be more than what the majority describes as "minimal."

{¶ 48} In addition to Lawson's refuse hauling, he also performed other tasks for the village. Pennington stated that, as part of his duties as a councilman on the streets committee, "Lawson [would] buy and lay coal patch to fill pot holes." Also, every year, Lawson decorated the town's 30 telephone poles with flags on Memorial Day, Labor Day, and the Fourth of July. "Lawson [drove] the dump truck to each post or telephone pole, [got] in the back of the dump truck, [raised] the dump bin * * * and [put] the flags in place. * * * Lawson remove[d] the flags as well." Combs further stated that Lawson hauled gravel, hauled brush, cut downed tree limbs, and emptied garbage cans for the village on a regular basis.

{¶ 49} Additionally, Lawson attached and removed a snow plow from the village's truck every year. Lawson plowed the village streets, the driveways of some local residents, and, on at least one occasion, the Preble–Shawnee school district.

{¶ 50} In addition to these tasks, Lawson mowed several properties with a push mower. Combs averred, "I have seen Lawson use the village push lawn mower and weed eater and cut grass on village property during the summer months for the past 10 years." Pennington stated that Lawson "additionally cut[ ] approximately five law[n]s for residents of the village." Combs formerly owned a gun shop where Lawson mowed the lawn for $10 in cash each time.

{¶ 51} Combs's affidavit provided two other examples of Lawson's capability to perform work. He stated, "Approximately 7 years ago I knew Lawson to make wood furniture in the basement of his brother-in-law's shop. * * * Lawson made furniture by request only and made it for other people." Aside from constructing furniture, Lawson assisted another village resident with a roofing project, although he denied both activities when confronted at the Industrial Commission hearing. Combs stated that "at least 5 or 6 years ago, I saw Lawson assist with putting metal peeks on the roof [of a garage]. To do this, Lawson was on the roof of the building."

{¶ 52} Under similar fact patterns, this court has upheld cases in which the Industrial Commission terminated a claimant's PTD status after consideration of evidence demonstrating the claimant's capability to engage in sustained remunerative employment. For example, a claimant lost PTD status after concealing intermittent paid overnight or multinight babysitting services, selling tickets and conducting walking tours in exchange for free travel, and answering phones, filing, and faxing for her brothers' businesses. See *State ex rel. Alesci v. Indus.*

*Comm.*, 97 Ohio St.3d 210, 2002-Ohio-5932, 777 N.E.2d 835. Another PTD recipient lost an award because he regularly performed paid home improvement and maintenance jobs and specifically denied engaging in sustained remunerative work until confronted with the evidence against him. See *State ex rel. Kirby v. Indus. Comm.*, 97 Ohio St.3d 427, 2002-Ohio-6668, 780 N.E.2d 275.

{¶ 53} Here, Lawson unquestionably sustained a major back injury that caused him pain and suffering and prevented him from performing certain kinds of work. However, as with the aforementioned claimants, the commission terminated Lawson's PTD after it determined from the evidence that he could engage in sustained remunerative activity. And this record, in my view, does contain evidence supporting that determination.

{¶ 54} Finally, the record also contains evidence supporting the commission's finding that Lawson fraudulently induced the commission to award him PTD compensation in 1995. As part of the application process, Lawson completed a vocational evaluation questionnaire, a major component for determining whether the claimant is eligible for PTD compensation. Question 6(e) of the questionnaire asked him to "list other activities you do or have done that may be related to work. Describe volunteer work or other services you haven't mentioned else-where in this questionnaire." Lawson responded that he "watched [his] wife's shop for a while daily (1 hour) when she went to work." Also on the question-naire, Lawson claimed to have "done no physical labor in ten years."

{¶ 55} At the hearing regarding the revocation of PTD compensation, the bureau presented evidence that Lawson dumped two loads of refuse in the landfill one day before he completed the vocational evaluation questionnaire. The bureau questioned Lawson why he did not list these activities or any other work he performed in his questionnaire responses. Lawson replied that he did not remember why he had failed to disclose this information.

{¶ 56} Based on the foregoing, I would affirm the judgment of the court of appeals.

LUNDBERG STRATTON, J., concurs in the foregoing dissenting opinion.

———————

Casper & Casper and Douglas W. Casper, for appellant.

Jim Petro, Attorney General, and Phil Wright Jr., Assistant Attorney General, for appellee.