DECISION
{¶ 1} Relator, Harvey Marlow, commenced this original action requesting a writ of mandamus that orders respondent Industrial Commission of Ohio ("the commission"), to vacate its order terminating permanent total disability ("PTD") compensation, declaring overpayment and finding relator fraudulently obtained the compensation, and to enter an order reinstating PTD compensation.
 {¶ 2} Pursuant to Civ.R. 53 and Section (M), Loc.R. 12 of the Tenth Appellate District, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In his decision, the magistrate concluded that the commission did not abuse its discretion when it terminated relator's PTD compensation, declared an overpayment, and found relator fraudulently obtained the compensation because sufficient evidence existed to support the commission's determination that relator was employed as a minister by the First Free Will Baptist Church of Knoxville, Tennessee, and had received remuneration for said employment since November 1, 2003, while receiving PTD compensation. Accordingly, the magistrate recommended this court should deny the requested writ of mandamus.
 {¶ 3} In his objections to the magistrate's decision, relator essentially reargues the same points addressed in the magistrate's decision.
 {¶ 4} Following an independent review of the matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, relator's objections to the magistrate's decision are overruled and we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, this court hereby denies the requested writ of mandamus.
Writ of mandamus denied.
Petree and Brown, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State ex rel. Harvey Marlow, :
Relator, :
v. : No. 05AP-539
The Industrial Commission of Ohio : (REGULAR CALENDAR) and Hammer Leasing Company, : :
Respondents. :
 MAGISTRATE'S DECISION Rendered on October 31, 2005 Yulish, Twohig Associates, Jared D. Cook and CatherineTwohig-Lietzke, for relator.
Jim Petro, Attorney General, and Gerald H. Waterman, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 5} In this original action, relator, Harvey Marlow, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order terminating permanent total disability ("PTD") compensation and declaring an overpayment, and also finding that relator fraudulently obtained the compensation, and to enter an order reinstating PTD compensation.
Findings of Fact:
 {¶ 6} 1. On September 20, 1996, relator sustained an industrial injury when a beam fell on his foot as he was unloading a truck. The industrial claim is allowed for "left foot contusion; cellulites left foot; osteomyelitis left foot; ulceration left foot; left plantar fibromatosis; diabetes juvenile uncomplicated," and is assigned claim number 96-498182.
 {¶ 7} 2. On July 6, 2001, relator filed an application for PTD compensation.
 {¶ 8} 3. Following a March 26, 2002 hearing, a staff hearing officer ("SHO") awarded PTD compensation beginning March 2, 2001. The SHO order explains:
In a report dated 03/02/2001, Dr. Paul indicated that the claimant is permanently and totally disabled as a result of the allowed conditions of claim 96-498182.
Based on the report of Dr. Paul, which is persuasive, the Staff Hearing Officer finds that the claimant is permanently and totally disabled on a medical impairment basis, with consideration of non-medical disability factors rendered unnecessary. Accordingly, the IC-2 Application filed 07/06/2001 is granted.
Alternatively, even if it were assumed that the claimant had the residual functional capacity to perform sedentary work activity, as indicated by Dr. Breeding's 11/19/2001 report, the Staffing Hearing Officer would find that the claimant's age, his limited education, and his work history of medium to heavy positions would be negative disability factors and would combine with his medical impairment to render him permanently and totally disabled in any event.
The start date for the award is based on the report of Dr. Paul certifying permanent total disability.
 {¶ 9} 4. In August 2004, the Mansfield Special Investigations Unit ("SIU") of the Ohio Bureau of Workers' Compensation ("bureau") received a telephone call from an anonymous source who claimed that relator was being paid for preaching services in the guise of mileage reimbursements by the First Free Will Baptist Church ("church") of Knoxville, Tennessee.
 {¶ 10} 5. According to the SIU report of the ensuing investigation, on September 7, 2004, Special Agent McCloskey telephoned the church and spoke to Hugh Jenks who serves as the church's head trustee. Jenks informed McCloskey that relator is paid a mileage reimbursement of $500 per month that also includes preaching services. According to the SIU report, Jenks stated that relator had initially asked the church to pay his wages "under the table" because he was receiving disability benefits, but the church refused. Jenks further stated that his attorney informed him that relator could receive wages as mileage reimbursements "without posing a conflict with his disability benefits."
 {¶ 11} According to the SIU report, on September 9, 2004, the anonymous source again called SIU and spoke to fraud analyst McCorkle. The source informed McCorkle that the church wanted to discuss the issue of relator's wages and disability benefits at their next meeting at the end of the month. McCorkle advised the source that SIU agents would be traveling to Tennessee to conduct interviews.
 {¶ 12} 6. According to the SIU report, on September 15, 2004, agent McCloskey telephoned the church and spoke to Jenks. Jenks informed McCloskey that relator drives approximately 25 miles one way from his residence to the church and that he conducts two services on Sundays and one service on Wednesday evenings. Relator is paid mileage reimbursement at $.50 per mile. Agent McCloskey asked Jenks to provide him with copies of all cancelled checks paid to relator by the church.
 {¶ 13} 7. According to the SIU report, on September 21, 2004, McCloskey obtained two "Are you working letters" dated April 2, 2003 and April 1, 2004, that were signed by relator. On September 27, 2004, McCloskey received cancelled checks paid to relator by the church.
 {¶ 14} 8. According to the SIU report, on Friday, September 30, 2004, special agents McCloskey and DePolo interviewed church trustees Hugh Jenks, Clyde and Joe Nipper at the church. Special agent McCloskey signed a typewritten memorandum of the interview. The memorandum states:
Trustees stated that MARLOW became the church's full-time pastor in November of 2003. Prior to November of 2003, MARLOW would fill in at the church when needed. After MARLOW was informed that the church was going to take a vote on becoming the pastor, MARLOW indicated that he would work for free. The trustees informed MARLOW that if he wanted to be the pastor he would have to be paid. Trustees offered MARLOW $800-$1000 however he declined this amount stating it would be a hardship on the church. MARLOW then informed that [sic] the trustees that they could pay him $500, the trustees agreed.
After MARLOW was voted in he had asked the trustees to pay him the $500 under the table. The trustees stated they didn't operate that way and they wouldn't pay him under the table. Hugh Jenks, head trustee, then offered to pay MARLOW under his wife's name since she was already helping out at the church, playing the piano and doing the church bulletins. MARLOW agreed to the offer.
Jenks stated that after 4-5 months of paying MARLOW under his wife's name he approached the church treasurer and informed her that he didn't feel right paying MARLOW the $500 a month under his wife's name and that he wanted to have the checks put in MARLOW'S name. A special call meeting was then held by the trustees which MARLOW attended to discuss the issues of his pay. At the meeting MARLOW informed the trustees for the first time that he was receiving workers compensation and that he couldn't have the checks in his name since he didn't want to lose his disability.
PALMER then suggested the idea that they could pay MARLOW the $500 as mileage reimbursements and this way he would not have to claim it as income. MARLOW agreed to this and from July 2004 forward MARLOW received the $500 via check in his name as mileage reimbursements.
The trustees indicated that MARLOW only lives approx. 25-30 miles from the church and he only comes out to the church for Wednesday evenings service, Sunday morning service and Sunday evening service. Trustees stated they have always seen the $500 they pay to MARLOW per month as payment for his services and not mileage. The trustees stated they are not sure if MARLOW is even an ordained pastor. When MARLOW first came to the church he had told the trustees that he had done some pastor work at the Fairview Baptist Church. Trustees stated they probably made a mistake and never confirmed this with Fairview Baptist. Trustees also stated that they are very unhappy with MARLOW as their pastor. Trustees indicate that when MARLOW came to their church he brought with him some of his own people. The church only has a total of 40 members and a majority of the members came with MARLOW. Trustees want to remove MARLOW as the pastor however it takes a vote of the members and since the majority of the members are with MARLOW they would be unable to vote him out. MARLOW is unable to perform weddings, funerals or perform visits due to his health.
The trustees provided agents with the phone number for the church treasurer so they could speak to her in regards to the mileage and how she came up with the formula of .50 per mile at 1000 miles a month. Trustees were asked if they would provide a voluntary statement which they agreed to. S/A McCloskey wrote out the statement and then read it back to the trustees. The trustees agreed with the statement and then all three of them signed it.
(Emphasis sic.)
 {¶ 15} 9. According to the SIU report, on October 1, 2004, relator was interviewed at his residence at Clinton, Tennessee, by agents McCloskey and DePolo. Agent McCloskey signed a typewritten memorandum of the interview. The memorandum states:
Agents informed MARLOW that they had some questions pertaining to his claim and his activities with the First Free Will Baptist Church of Knoxville. MARLOW stated that he is the advisor for the First Free Will Baptist Church. MARLOW stated he performs two services on Sundays and one service on Wednesday. MARLOW stated all he receives from the church is $500 a month which covers his mileage expenses. MARLOW stated he has been the advisor at the church since November of 2003. MARLOW stated he devotes 10 hours a week to the church for the three services and time preparing for the services. MARLOW stated his wife plays the piano, does the bulletin and drops off the Sunday service audio tapes to a local radio station that plays them once a week. MARLOW stated he is paid no money from the radio station.
MARLOW stated when he first came to the church it only had 12 members however the church currently has 43 members. MARLOW stated he was referred to the church by Dale Walker who use to be the pastor until he took over in November of 2003. Prior to November 2003, MARLOW would perform services at the church when needed. The church would give a gift of $25.00 to whoever performed the services. MARLOW stated the gift money would basically cover the pastor's expenses for mileage/fuel. MARLOW stated he travels 50 miles one way to the church from his residence.
MARLOW stated that when he was first offered the job as the full-time pastor to the church he had told the church trustees that they didn't need to pay him anything for his services since he was on disability and could not earn wages. The trustees informed MARLOW that if he is to be the church's pastor then he would have to be paid something. The trustees offered MARLOW $700-$1,000 which he turned down since he thought it would pose a hardship to the church. MARLOW stated he told the trustees they could pay him $500 per month. MARLOW stated he never told the trustees that he wanted to be paid in cash or under the table. The trustees came up with the idea of paying him under his wife's name which he had no problem with since she would be doing all of the driving due to the fact that MARLOW is unable to drive himself because of his amputated lower left leg.
MARLOW stated the church paid him under his wife's name for approx. 4-5 months, where one day he was informed by the trustees that they were no longer going to pay him under his wife's name. MARLOW was informed that they would pay him the $500 per month under his name as mileage reimbursements. MARLOW stated again he had no problem with this since the money was already being used to cover his vehicle expenses.
MARLOW stated he did have a conversation with the church treasurer, Shirley Palmer, in regards to not having the $500 paid to him as taxable income since he would lose a good chunk of it to taxes and he uses the money to pay for his expenses. MARLOW stated the church has always known he was receiving disability for his workers compensation injuries and this was made very clear to them from the beginning. MARLOW stated if the church told him tomorrow that they were no longer going to pay him the $500 a month for mileage he would still do what he is doing for the church.
MARLOW was asked if he would be willing to provide agents with a voluntary statement, MARLOW agreed. Agents wrote out the statement and then read it back to MARLOW. MARLOW agreed to the statement and asked the agents to add at the end of the statement that he doesn't consider himself the church pastor but the church advisor. MARLOW then signed and dated the statement.
(Emphasis sic.)
 {¶ 16} 10. On January 3, 2005, the bureau moved to terminate PTD compensation, for a declaration of an overpayment, and for a finding of fraud.
 {¶ 17} 11. Following a February 28, 2005 hearing, an SHO issued an order terminating PTD compensation effective November 1, 2003, declaring an overpayment, and finding that relator obtained the compensation fraudulently. The SHO order explains:
It is the finding of the Staff Hearing Officer that the injured worker was a part time/full time pastor for the First Free Will Baptist Church in Knoxville, Tennessee from 11/01/2003 and is no longer permanently and totally disabled. Therefore, it is the finding that Permanent Total Disability Compensation is terminated effective 11/01/2003 and any Permanent Total Disability Compensation after this date is declared an overpayment to be collected pursuant to the ORC. The basis for this decision is the Bureau of Workers' Compensation Special Investigations Report and the attached affidavits and materials. Specifically, the signed affidavit from Hugh Jenks, Joe Nipper and Clyde Nipper (Church Trustees) dated 09/30/2004 indicates the injured worker was actively engaged in work as their pastor preaching up to three (3) times a week and performing other duties. The copies of checks on file and the aforementioned affidavit indicates he was receiving substantial remuneration for this work. Therefore, the injured worker is no longer entitled to receive Permanent Total Disability benefits effective 11/01/2003 (The date when the injured worker stated he first became employed by the First Free Will Baptist Church).
It is further the finding of the Staff Hearing Officer that the injured worker's activities rose to the level that he intentionally committed fraud in receiving the Permanent Total Disability benefits while working for remuneration. The injured worker falsely represented on the completed questionnaires dated 04/02/2003 and 04/01/2004 that his working status did not change and in the 04/01/2004 questionnaire the injured worker stated he has not worked since he was granted Permanent and Total Disability and is not currently working. Obviously, this is a false statement answered in this way as a representation that he was unemployed. The misrepresentation was "material" to the continued receipt of Permanent Total Disability Compensation. The injured worker knew this was a false statement because he completed the questionnaire sent to him by the Bureau of Workers' Compensation and told them he was not working and had not worked since the granting of Permanent Total Disability. The Bureau of Workers' Compensation "relied" upon the misrepresentation to continue the payment of Permanent Total Disability benefits and the reliance was "justifiable." This was the only evidence they could rely upon at the time of the statement (questionnaire). The Bureau of Worker's [sic] Compensation was injured as the "proximate" result of this reliance. They continued to pay money out of the fund for this claim even through [sic] the injured worker was employed by the church in Knoxville, Tennessee. The affidavit from the Church Trustees (Hugh Jenks, Joe Nipper and Clyde Nipper) verifies that the injured worker intentionally tried to mislead the Bureau of Workers' Compensation and receive remuneration from the church at the same time he received Permanent Total Disability Compensation. The affidavit supports the finding of fraud in this order.
 {¶ 18} 12. On April 9, 2005, the commission mailed an order denying relator's request for reconsideration of the SHO order of February 28, 2005.
 {¶ 19} 13. On May 27, 2005, relator, Harvey Marlow, filed this mandamus action.
Conclusions of Law:
 {¶ 20} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 21} Recently, in State ex rel. Lawson v. Mondie Forge,104 Ohio St.3d 39, 2004-Ohio-6086, at ¶ 15, the court had occasion to address the question: "How active can a person be and still be deemed eligible for PTD?" The Lawson court states, at ¶ 16-21:
PTD pivots on a single question: Is the claimant capable of sustained remunerative employment? State ex rel. Stephenson v.Indus. Comm. (1987), 31 Ohio St.3d 167 * * *. Payment of PTD is inappropriate where there is evidence of (1) actual sustained remunerative employment, State ex rel. Kirby v. Indus. Comm.,97 Ohio St.3d 427, 2002-Ohio-6668 * * *; (2) the physical ability to do sustained remunerative employment, State ex rel. Schultzv. Indus. Comm., 96 Ohio St.3d 27, 2002-Ohio-3316 * * *; or (3) activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award. SeeState ex rel. Timmerman Truss, Inc. v. Indus. Comm.,102 Ohio St.3d 244, 2004-Ohio-2589, * * * ¶ 26.
The first criterion is the cleanest. Nothing demonstrates capacity better than actual performance. No speculation or residual doubt is involved. Unfortunately, that is not always the case where the other two criteria are involved[.] * * *
* * *
Neither "sustained" nor "work" has been conclusively defined for workers' compensation purposes. As to the latter, clearly, labor exchanged for pay is work. Schultz also teaches that unpaid activity that is potentially remunerative can be considered for purposes of establishing a physical capacity for remunerative employment. This principle, however, should always be thoughtfully approached, particularly when PTD is at issue.
One of the most enduring (though not often explicitly stated) misconceptions about PTD is that once it is granted, the recipient must thereafter remain virtually housebound. This is a fallacy. PTD exempts no one from life's daily demands. Groceries must be purchased and meals cooked. Errands must be run and appointments kept. The yard must be tended and the dog walked. Where children are involved, there may be significant chauffeur time. For some, family and friends shoulder much of the burden. Others, on the other hand, lack such support, leaving the onus of these chores on the PTD claimant.
These simple activities can nevertheless often generate considerable controversy. That is because all of these tasks are potentially remunerative. From the school cafeteria to the four-star restaurant, people are paid to prepare meals. People are paid for lawn and child care. Many people earn their living behind the wheel. State ex rel. Parma Comm. Gen. Hosp. v.Jankowski, 95 Ohio St.3d 340, 2002-Ohio-2336, * * * acknowledged this and cautioned against an automatic disqualification from compensation based on the performance of routine tasks, regardless of their potential for payment. * * *
(Emphasis sic.)
 {¶ 22} Here, relator relies heavily on the Lawson case to support his contention that the commission abused its discretion in terminating PTD compensation. However, the Lawson case does not support relator's contention that the commission abused its discretion.
 {¶ 23} Analysis begins with the SHO order of February 28, 2005. The SHO found that relator was actively engaged in work as the church pastor preaching up to three times per week. The SHO found that relator "was receiving substantial remuneration for this work," and thus he was ineligible for PTD compensation.
 {¶ 24} Of the three criteria listed by the Lawson court where PTD is considered inappropriate, Lawson at ¶ 16, the commission clearly based its determination of PTD ineligibility on the first criteria, i.e., that relator was engaged in actual sustained remunerative employment. As the Lawson court states, "[t]he first criterion is the cleanest." Id. at ¶ 17. Nothing demonstrates a capacity for sustained remunerative employment better than actual performance. No speculation or residual doubt is involved.
 {¶ 25} In his interview of October 1, 2004, relator admits that, when he was first offered the job as pastor, he was told by the church trustees that he would have to be paid something if he is to be the church pastor. Relator agreed with the trustees that he would be paid $500 per month.
 {¶ 26} Initially, the trustees agreed with the idea of paying the $500 to relator's wife since she was active in the church. Later, the trustees decided that they would pay him the $500 per month under his name as mileage reimbursement. Relator agreed to this and accepted the $500 per month.
 {¶ 27} In his interview, relator stated that he devotes ten hours a week to the church for the three services and time preparation for the services.
 {¶ 28} Clearly, under the undisputed factual circumstances of this case, relator was engaged in sustained remunerative employment and the commission correctly found that relator was receiving "substantial remuneration for this work." Certainly, receiving $500 per month for devoting 10 hours per week to the job can be viewed as receiving substantial remuneration for the work performed.
 {¶ 29} Here, relator claims that he was simply reimbursed for his commute to and from the church. Relator seems to suggest that, because the trustees agreed to call the monthly payments to relator mileage reimbursement, the commission had no evidence that relator was receiving remuneration for his pastoring services. Relator's suggestion is incorrect.
 {¶ 30} Clearly, relator was not being reimbursed for incurring travel expenses for the church, as relator seems to suggest. There is no evidence that relator's pastoral duties required him to travel from the church to sites away from the church. The undisputed evidence is that relator commuted to his work place at the church much like any other worker commutes to his or her job site.
 {¶ 31} Contrary to relator's suggestion here, his personal commuting expenses are irrelevant to the question of whether he was being substantially remunerated.
 {¶ 32} Relator also posits that his preaching cannot be viewed as work activity because "[q]uoting scripture and reading from the Bible at three one-hour services per week simply is not work activity." (Relator's brief.) The Lawson case directly answers relator's assertion.
 {¶ 33} Almost any task involving "life's daily demands" can be performed for remuneration, as the Lawson court explains. In the realm of religion, certain tasks, such as reading scripture to the congregation or even preaching, can be performed by volunteers who receive no remuneration. Those tasks can also be performed for remuneration. When those tasks are performed for remuneration, they become work activity.
 {¶ 34} Relator also posits that his preaching activity does not establish a medical capacity for work greater than sedentary. Relator seems to suggests that the commission found that he was engaging in activities so medically inconsistent with the disability evidence relating to his PTD award that his activities must be viewed as impeaching the medical evidence upon which the PTD award was premised. Relator's suggestion simply misunderstands the commission's determination.
 {¶ 35} Contrary to relator's suggestion, the commission did not determine that the preaching activity, by itself, rendered him ineligible for PTD. As previously noted, the commission determined that relator was receiving substantial remuneration for the preaching activity.
 {¶ 36} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.