THE STATE EX REL. MCDANIEL, APPELLEE, *v.* INDUSTRIAL
COMMISSION OF OHIO, APPELLANT, ET AL.

[Cite as *State ex rel. McDaniel v. Indus. Comm.,*
118 Ohio St.3d 319, 2008-Ohio-2227.]

(No. 2007–1042—Submitted April 8, 2008—Decided May 15, 2008.)

Per Curiam.

{¶ 1} Appellee, Carl C. McDaniel, was awarded permanent total disability compensation in 1991. In 2006, appellant, Industrial Commission of Ohio, determined that McDaniel had undertaken sustained remunerative employment while receiving this compensation, and it terminated that award. The court of appeals vacated that order, citing *State ex rel. Lawson v. Mondie Forge,* 104 Ohio St.3d 39, 2004-Ohio-6086, 817 N.E.2d 880. The commission challenges that judgment.

{¶ 2} In 2003, the Bureau of Workers' Compensation received information that McDaniel was operating a lawn-care business. Investigation revealed that the company had started in 2001 as "RLM–Residential Lawn Mowing." The name was later changed to "American Lawn Service" in the hope of increasing business. McDaniel distributed business cards describing himself as "owner operator." He also placed business ads in the local paper and often drove a truck with the company name and his own phone number on the side.

{¶ 3} At least six customers had used McDaniel at one time or another on a repeat basis, including a local church. Except for a family friend, all of his individual customers had paid him between $20 and $30 per visit. With the exception of a $90 check from the church, all payments were in cash.

{¶ 4} McDaniel was put under surveillance on two days in September 2003. On the first occasion, McDaniel was observed working at three homes successively. He loaded and unloaded mowers, leaf blowers, and weed trimmers from his truck. He sometimes used a push mower to cut the lawns and cleaned up by using a gas-line trimmer and a gas-powered blower. He was observed performing these same tasks one week later and was also seen using a riding mower.

{¶ 5} When confronted by the bureau, McDaniel originally denied working or operating a lawn business. Provided with the evidence against him, he stated

that the business was his ex-wife's and that he was only helping her. His ex-wife, Sigrid Brown–McDaniel, contradicted this explanation and stated that McDaniel had approached her in early 2001 with his plan of starting a lawn-care business. He "asked her if he could use her name to associate with business. At that time, [she] stated that she agreed to do it and didn't think anything of it."

{¶ 6} Brown–McDaniel specifically denied that she had invested any money or labor in the business (she did counter-sign checks). She related that over the "past few years McDaniel had completed multiple jobs for multiple people." She also stated that during the fall of 2003, McDaniel "came to her home and accused her of turning him in to the BWC. She stated he told her that someone told him that they had seen a person taking pictures of him working. Brown–McDaniel stated that she told McDaniel that if he was worried about getting caught, he should just quit mowing. Brown–McDaniel stated that as far as she knew, McDaniel quit mowing lawns after he accused her of turning him in."

{¶ 7} Carl McDaniel ultimately admitted all the activity reported by the bureau investigators. The investigators stated that McDaniel had indicated that he knew "providing lawn care services while receiving PTD [permanent total disability] benefits was wrong. He stated that even while he was doing it, he considered that his activity could possibly jeopardize his eligibility for PTD benefits."

{¶ 8} The bureau moved the commission to terminate permanent total disability compensation, declare an overpayment as of May 10, 2001, and issue a finding of civil fraud. The commission granted those requests. In a lengthy order, the commission found that McDaniel's activities constituted sustained remunerative employment, one of several bases upon which an award can be terminated.

{¶ 9} The Court of Appeals for Franklin County vacated this finding, relying on *Lawson*, 104 Ohio St.3d 39, 2004-Ohio-6086, 817 N.E.2d 880, ¶ 3. The court held that if 207 documented activities of a questionable nature did not foreclose permanent total disability compensation in *Lawson*, the fewer activities that McDaniel had engaged in also could not. Id. The court also stated:

{¶ 10} "Admittedly, a complicating factor in the present case is that relator was operating a business and advertising such, while the claimant in *Lawson* was engaging in volunteer activities largely associated with his position on the city council. Nevertheless, we do not find that this fact is significant enough to take the current case out of the ambit of the circumstances and holding in *Lawson*. Notably, although the commission complains that the fact relator was advertising the business and had changed the name in order to obtain more business demonstrates that relator could engage in even more sustained, ongoing activities, any hypothetical increase in the frequency or intensity of physical activities in the future is not relevant to the present case, although it may be relevant in the future. While we do not condone relator's failure to inform the commission of

his activities and his evasiveness when confronted by the investigators from the Bureau of Workers' Compensation, we cannot find that there is some evidence of relator's ability to engage in sustained remunerative employment." *State ex rel. McDaniel v. Indus. Comm.*, Franklin App. No. 06AP–513, 2007-Ohio-2009, at ¶ 4.

{¶ 11} The commission now appeals to this court as of right.

{¶ 12} Permanent total disability compensation is prohibited when there is evidence of "(1) actual sustained remunerative employment, (2) the physical ability to do sustained remunerative employment, or (3) activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award." (Citations omitted.) *Lawson*, 104 Ohio St.3d 39, 2004-Ohio-6086, 817 N.E.2d 880, at ¶ 16. The commission concluded that McDaniel had engaged in sustained remunerative employment. The court of appeals disagreed, based on a reading of *Lawson* that we decline to endorse.

{¶ 13} *Lawson* discredited the common, yet unspoken, belief that recipients of permanent total disability compensation are effectively required to remain housebound in order to preserve compensation eligibility. It instead recognized that "PTD exempts no one from life's daily demands." Id. at ¶ 20. *Lawson* also, however, understood that even ordinary tasks could generate controversy because so many could be potentially remunerative and accordingly warned against "automatic disqualification from compensation based on the performance of routine tasks regardless of their potential for payment." Id. at ¶ 21, citing *State ex rel. Parma Community Gen. Hosp. v. Jankowski*, 95 Ohio St.3d 340, 2002-Ohio-2336, 767 N.E.2d 1143. A more substantive inquiry into McDaniel's activities is required.

{¶ 14} The court of appeals did not pursue this inquiry. Its analysis was purely numerical. It reasoned that because the 207 documented activities in *Lawson* did not foreclose permanent total disability, the few dozen here, by necessity, could not. Id. at ¶ 3. We disagree.

{¶ 15} The crux of *Lawson* is that numbers are meaningless without context. Otherwise, it would be difficult to explain why 95 activities terminated compensation in *State ex rel. Spohn v. Indus. Comm.*, 115 Ohio St.3d 329, 2007-Ohio-5027, 875 N.E.2d 52, ¶ 10, while 207 in *Lawson* did not. Context provides both a time frame and character of activity. In *Spohn*, the claimant had played 95 rounds of golf in less than a year. Id. at ¶ 29. In *Lawson*, the documented activities had spanned eight years. *Lawson*, 104 Ohio St.3d 39, 2004-Ohio-6086, 817 N.E.2d 880, ¶ 4. Equally important, most of the activities in *Spohn* were inconsistent with the physical restrictions that allegedly prevented Spohn from working. Few activities, if any, were inconsistent in *Lawson*.

{¶ 16} Attempting to compare the facts in this case to those in *Lawson* yields the same incongruity. The quantity of observed activity in *Lawson* was ultimate-

ly inconsequential because Lawson was not being paid for his activities, nor was he engaging in activity inconsistent with his restrictions. McDaniel, on the other hand, was paid for nearly all his endeavors, so numbers applicable to *Lawson*—even if the court of appeals' theory is accepted—would not necessarily apply here.

{¶ 17} Context provides another reason why numerical analysis is so often incomplete. Almost all of McDaniel's activities were done to promote and expand his lawn-care business. The court of appeals, in looking only at numbers, effectively excused McDaniel's business activities because his business was not yet big enough to generate an "unacceptable" amount of activity or income. This, in turn, begs the question of how much is too much. McDaniel's activities, done in connection with a business enterprise that he had hoped to nurture and expand, were appropriate for commission consideration.

{¶ 18} The commission provided a lengthy, well-reasoned decision that supports its conclusion that McDaniel was engaged in sustained remunerative work and committed fraud. We defer to its determination and hereby reverse the judgment of the court of appeals.

Judgment reversed.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

———————

Casper & Casper and Douglas W. Casper, for appellee.

Thomas R. Winters, First Assistant Attorney General, and Andrew J. Alatis, Assistant Attorney General, for appellant.