DECISION
{¶ 1} Relator, Jerome Dobies, commenced this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order terminating permanent total disability ("PTD") compensation and declaring an overpayment and finding that relator fraudulently obtained the compensation, and to enter an order reinstating PTD compensation.
 {¶ 2} This court referred the matter to a magistrate of this court, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) Therein, the magistrate determined that: (1) there is some evidence upon which the commission relied to support its finding that relator has been able to perform sustained remunerative employment as early as May 12, 1998; and (2) relator has failed to show that the commission abused its discretion in finding that the compensation was fraudulently obtained. The magistrate recommended that this court deny relator's request for a writ of mandamus.
 {¶ 3} Relator has filed no objections to the magistrate's decision.
 {¶ 4} Finding no error of law or other defect on the face of the magistrate's decision, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny relator's requested writ of mandamus.
Writ denied.
Sadler and French, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Jerome Dobies, : Relator, : v. : No. 05AP-638 Industrial Commission of Ohio and : (REGULAR CALENDAR) Transportation Unlimited, Inc., : Respondents. :
 MAGISTRATE'S DECISION Rendered on February 24, 2006 Michael J. Goldberg, for relator.
Jim Petro, Attorney General, and Shawn M. Wollam, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 5} In this original action, relator, Jerome Dobies, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order terminating permanent total disability ("PTD") compensation and declaring an overpayment and finding that relator fraudulently obtained the com-pensation, and to enter an order reinstating PTD compensation.
Findings of Fact:
 {¶ 6} 1. On August 4, 1986, relator sustained his most recent industrial injury while employed as a truck driver or deliveryman for respondent Transportation Unlimited, Inc. ("Transportation Unlimited"), a state-fund employer. Apparently, relator's job duties included truck or trailer loading. The August 4, 1986 injury occurred when relator felt pain in his back while moving a bundle of steel with a pry bar. The injury is allowed for "back; fracture L5 transverse process with spasm; acute lumbar strain," and is assigned claim number 86-20703.
 {¶ 7} 2. Relator has five industrial claims that preceded his August 4, 1986 injury. Four of those claims also arose out of his employment at Transportation Unlimited.
 {¶ 8} 3. The earliest injury occurred on February 6, 1976, and is allowed for "sprain and myositis of the cervical-dorsal and lumbar spine."
 {¶ 9} 4. Relator's first injury with Transportation Unlimited occurred on November 22, 1982, and is allowed for "left inguinal testicular low back sprain and strain due to trauma."
 {¶ 10} 5. Relator's second injury with Transportation Unlimited occurred September 16, 1983, and is allowed for "sprain neck."
 {¶ 11} 6. Relator's third injury with Transportation Unlimited occurred January 31, 1985, and is allowed for "right ankle sprain."
 {¶ 12} 7. Relator's fourth injury with Transportation Unlimited occurred on May 15, 1985, and is allowed for "acute lumbar myositis."
 {¶ 13} 8. On June 20, 1991, relator was examined by John D. Zachary, M.D., on behalf of the Ohio Bureau of Workers' Compensation ("bureau"). Dr. Zachary wrote:
The patient at the present time is a 45 year old male who said that he injured his back while moving some bar metal with acute pain in the back. He had a diagnosis of possible L5 transverse fracture with acute lumbosacral strain. He was treated conservatively for a short period of time and sub-sequently had tests confirming a herniated L4-5 disc on the right side with a large herniation. On 11-18-86, he had a lumbar laminectomy and discectomy by Dr. Hergenroeder. The patient improved post-surgery, but subsequently devel-ped back pain and leg pain. Subsequent myelogram showed scar tissue or recurrent disc. However, subsequent MRI showed evidence consistent with recurrent disc protrusion on the right side as well as evidence for arachnoiditis, probably post-myelogram.
* * *
Based upon my evaluation of this patient, he is suffering from degenerative changes of the L4-5 level with foraminal stenosis, recurrent disc protrusion, and right sciatica. The patient has been offered repeat surgery by Dr. Collis for this condition. However, the patient has refused surgical treat-ment. Therefore, this patient should be considered perma-nently and totally disabled as a result of this condition. Since the patient's condition will not improve on conservative treatment, he cannot return to heavy labor with the present condition of his back.
 {¶ 14} 9. On October 10, 1991, relator filed an application for PTD compensation. In his application, relator cited to Dr. Zachary's report as evidence that he will never be able to work. Relator stated in the application that November 4, 1986, was the last day he had worked.
 {¶ 15} The PTD application asks the applicant: "What is your disabling condition(s)?" In response, relator wrote: "Severe lower back pain, [n]umbness in legs, feet constant pain, no lifting, no bending[,] no strenuous physical activities, emotional distress."
 {¶ 16} The PTD application also asks the applicant: "Explain how your condition prevents you from working." In response, relator wrote: "Unable to sit for extended period, leg and feet go numb unable to lift bend."
 {¶ 17} 10. Following a December 29, 1992 hearing, the commission issued a so-called interlocutory order that found relator to be permanently and totally disabled and awarded compensation for the closed period December 30, 1992 to April 10, 1993. Apparently, the compensation was later extended beyond April 10, 1993.
 {¶ 18} 11. Following an August 25, 1993 hearing, the then five-member commission issued an order finding that relator is permanently and totally disabled and awarding compensation indefinitely beyond the date of the hearing. The August 25, 1993 order states:
* * * This order is based particularly upon the report of Doctor Zachary, evidence in the file and/or evidence ad-duced at the hearing.
After reviewing the medical evidence relevant to the claimant's active industrial injury claims, the Commission finds that his low back injury restricts his functional capacity to the extent that it renders him permanently totally impaired. The medical evidence relied upon in making this deter-mination includes the report of BWC orthopedist Dr. Zachary. In his 6/20/91 report, Dr. Zachary opines that claimant's condition has reached maximum medical improve-ment, precludes his return to his former position of employ-ment, and that his allowed conditions render him perma-nently and totally disabled. The Commission also finds persuasive claimant's course of medical treatment in claim 86-20703 which has included a 1986 lumbar laminectomy, a 1987 hospitalization for lumbosacral pain, and a number of post-surgical diagnostic testing results indicating the pre-sence of significant lumbar problems. Thus, finding the fore-going medical evidence to be persuasive, claimant's application for permanent total disability is granted. * * * [N]otwithstanding claimant's relatively young age of 47 nor his high school educational level, it is concluded the claimant is medically precluded from returning to the active workforce and is entitled to permanent and total disability benefits.
 {¶ 19} 12. On January 29, 2004, the bureau's special investigations unit ("SIU") received an anonymous telephone call. The caller alleged that relator had delivered telephone books during April and May 2002 and 2003 while receiving disability compensation. The telephone call prompted an investigation that ultimately resulted in the filing of an SIU report.
 {¶ 20} 13. According to the SIU report, on June 21, 2004, agent Cronig conducted surveillance of relator's residence. At about 7:45 a.m., relator left his residence driving a white Isuzu box truck. Agent Cronig followed the truck to a parking lot. The entrance to the parking lot had a sign stating "Telephone Book Delivery Entrance." Relator was observed entering and exiting a building, meeting with a male, and then backing his truck to the rear of a truck trailer.
 {¶ 21} 14. According to the SIU report, on June 21, 2004, agent Cronig contacted a rental manager with Ryder Truck Rental. Agent Cronig was informed that the truck relator was operating had been rented by Product Development Corporation, that relator's name was listed on the rental contract as a driver, and that the truck was to be used for telephone book delivery.
 {¶ 22} 15. On June 24, 2004, agents Cronig and Mergen conducted surveillance of relator's residence. At about 7:28 a.m., relator was observed leaving his residence in the Isuzu box truck and was followed to the same facility that he had driven to on June 21, 2004. According to the SIU report, relator was observed and videoed:
* * * [A]rriving, holding papers in his left hand, enter the South East side of the building, exit the South East side of the building, open the rear of the truck, move it near parked truck trailers, back to the rear of a truck trailer, walk in the parking lot, drive truck in the parking lot, talk to other people, enter the South East side of the building, exit the South East side of the building, talked to a person in the parking lot, enter the truck and exit the parking lot.
 {¶ 23} 16. On July 6, 2004, according to the SIU report, agent Cronig was informed by a clerk of the bureau's Garfield Heights office that he believed that, on June 25, 2004, relator was seen delivering telephone books to the Garfield Heights office. Later, SIU obtained a security video showing relator delivering telephone books on June 25, 2004, to the dock area of the Garfield Heights office.
 {¶ 24} 17. On July 7, 2004, agent Cronig sought relator's employment records from Product Development Corporation. Agent Cronig was given a verbal summary of the records and was promised that copies of the records would be sent to SIU. Agent Cronig was also verbally informed that relator had been employed by Product Development Corporation under the name and social security number of K.F. Dobies, who is relator's spouse.
 {¶ 25} 18. On July 7, 2004, agents Saunders and Brickman conducted surveillance of relator's residence. Again, operating the Isuzu box truck, relator was followed to the same facility that he had driven to on June 21 and June 24, 2004. According to the SIU report, relator was observed "meeting with a male, moving telephone books from the known truck to the male's automobile."
 {¶ 26} 19. According to the SIU report, on August 3, 2004, agents Cronig and Mergen interviewed Terry Speck ("Speck"), field supervisor for Product Development Corporation.
 {¶ 27} At the time of the interview, Speck was an 11-year employee of Product Development Corporation. Speck stated that about six years earlier he hired a person known to him as K.F. Dobies. Dobies (relator) was hired as an "independent distributor" for the delivery of telephone books. Relator was always paid by check payable to K.F. Dobies. Because Dobies was considered to be an independent distributor, no taxes were withheld from the checks he received.
 {¶ 28} During the interview, Speck was shown a photograph of relator's spouse, Karen F. Dobies, and a photograph of relator. Speck identified relator's photograph as the one depicting the employee known as K.F. Dobies. Speck did not recognize the photograph of relator's spouse.
 {¶ 29} 20. On August 9, 2004, agent Cronig received copies of relator's payroll records and cancelled checks from Product Development Corporation. The payroll records and checks begin with the year 1998 and continue each year through 2004.
 {¶ 30} 21. On August 24, 2004, agent Cronig obtained from the bureau a so-called "PTD Questionnaire" that the bureau annually mails to its PTD compensation recipients. This specific questionnaire is dated January 6, 1998, and is signed by relator. On the questionnaire, the bureau asked relator: "Have you returned to work during the last year?" Relator circled "No" in response to the query.
 {¶ 31} 22. On September 1, 2004, agent Cronig received from the bureau copies of the so-called PTD questionnaire mailed to relator for the years 2000 through 2004. Bureau records indicate that the questionnaires were not returned to the bureau for those years.
 {¶ 32} 23. On September 1, 2004, agent Cronig also received copies of 161 bureau warrants issued to relator for payment of PTD compensation. The dates of issue on the warrants begin June 1998 and end August 2004.
 {¶ 33} 24. On September 17, 2004, agents Cronig and Mergen appeared at relator's residence and asked relator for an interview. Relator declined to be interviewed. On September 21, 2004, relator and his attorney met with agents Cronig and Mergen at the bureau's Garfield Heights office. However, relator refused to answer any questions regarding any alleged work activity performed during his receipt of PTD benefits.
 {¶ 34} 25. On October 22, 2004, the bureau moved for termination of PTD compensation, declaration of an overpayment beginning July 28, 1998, and a finding that the overpaid compensation was obtained fraudulently.
 {¶ 35} 26. Following an April 7, 2005 hearing, a staff hearing officer ("SHO") issued an order stating:
It is the order of the Staff Hearing Officer that the motion dated 10/22/2004 is granted to the extent of this order.
The Staff Hearing Officer terminates payment of permanent and total disability compensation in this claim and declares an overpayment of all permanent and total disability com-pensation paid to claimant from 05/12/1998 to the present. The Staff Hearing Office[r] makes the finding that claimant engaged in fraud by misrepresentations and concealments; therefore, the Staff Hearing Officer finds that the above declared overpayment can be collected under the fraud provisions of ORC Section4123.511(J).
The Staff Hearing Officer has relied upon the video evidence as well as the Bureau of Workers' Compensation Special Investigations Report of Investigation and all attachments in making this decision. Based upon the 08/03/2004 memo-randum of interview of Terry Speck as well as the distributor application in the name of K.F. Dobies, the Staff Hearing Officer finds that claimant represented himself to be "K.F. Dobies" to Mr. Speck and used his spouse's social security number on the application. The evidence on file indicates that claimant was listed as the driver in a Ryder Truck rental agreement. The truck involved was used for the delivery of phone books. The evidence on file indicates that claimant delivered the phone books and unloaded them from the truck in bundles weighing at least twenty pounds. The Staff Hearing Officer finds that claimant was involved in phone book delivery between 1998 and 2004 and that his activities were inconsistent with his purported inability to engage in sustained remunerative employment. The information on file indicates that claimant earned $3,284.67 in 1998, $3,387.51 in 1999, $3,403.92 in 2000, $3,483.36 in 2001, $4,423.00 in 2002, $3,322.90 in 2003 and $2,849.48 in 2004 as a result of working as a phone book distributor.
The finding of fraud is based upon various factors. The Staff Hearing Officer finds that claimant knew (by signing the application for permanent and total disability compensation as well as one hundred sixty-one bi-weekly checks) that he had the obligation to notify the Bureau of Workers' Compensation if he worked. The Staff Hearing Officer finds that claimant failed to notify the Bureau of his employment status. The Staff Hearing Officer notes that claimant signed a Bureau of Workers' Compensation form, dated 01/06/1998, indicating that he was not working at that time. The Staff Hearing Officer finds that claimant failed to complete and return forms subsequent to 01/06/1998 when he was working. The Staff Hearing Officer further finds that claimant misrepresented himself to Terry Speck as being "K.F. Dobies" and used an erroneous social security number. The Staff Hearing Officer finds that the Bureau of Workers' Compensation paid claimant permanent and total disability compensation between 1998 and the present based upon a reliance upon claimant's misrepresentations and concealments.
The Staff Hearing Officer finds that the work history noted above demonstrates that claimant has been physically able to engage in sustained remunerative employment from at least 05/12/1998 (the first day he received payment) to the present. The 06/24/2004 video evidence shows claimant's ability to walk in a normal manner and drive a truck. The 06/25/2004 video evidence which was [a] surveillance tape done while claimant was unloading a pallet of phone books in bundles at a Bureau of Workers' Compensation office shows that claimant is physically capable of doing at least a light duty level of work which is inconsistent with his alleged ongoing request for permanent and total disability compensation.
 {¶ 36} 27. Relator moved for reconsideration of the SHO's order of April 7, 2005. The commission denied reconsideration.
 {¶ 37} 28. On June 17, 2005, relator, Jerome Dobies, filed this mandamus action.
Conclusions of Law:
 {¶ 38} Two issues are presented: (1) whether there is some evidence upon which the commission relied to support its finding that relator has been able to perform sustained remunerative employment since at least May 12, 1998; and (2) whether the commission abused its discretion by finding that the compensation relator received since May 12, 1998, was fraudulently obtained.
 {¶ 39} Finding no abuse of discretion on either issue, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 40} Recently, in State ex rel. Lawson v. Mondie Forge,104 Ohio St.3d 39, 2004-Ohio-6086, at ¶ 15, the court had occasion to address the question: "How active can a person be and still be deemed eligible for PTD?" The Lawson court states, at ¶ 16-21:
PTD pivots on a single question: Is the claimant capable of sustained remunerative employment? State ex rel. Stephenson v.Indus. Comm. (1987), 31 Ohio St.3d 167 * * *. Payment of PTD is inappropriate where there is evidence of (1) actual sustained remunerative employment, State ex rel. Kirby v. Indus. Comm.,97 Ohio St.3d 427, 2002-Ohio-6668 * * *; (2) the physical ability to do sustained remunerative employment, State ex rel. Schultzv. Indus. Comm., 96 Ohio St.3d 27, 2002-Ohio-3316 * * *; or (3) activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award. SeeState ex rel. Timmerman Truss, Inc. v. Indus. Comm.,102 Ohio St.3d 244, 2004-Ohio-2589, * * * ¶ 26.
The first criterion is the cleanest. Nothing demonstrates capacity better than actual performance. No speculation or residual doubt is involved. Unfortunately, that is not always the case where the other two criteria are involved[.] * * *
* * *
Neither "sustained" nor "work" has been conclusively defined for workers' compensation purposes. As to the latter, clearly, labor exchanged for pay is work. Schultz also teaches that unpaid activity that is potentially remunerative can be considered for purposes of establishing a physical capacity for remunerative employment. This principle, however, should always be thoughtfully approached, particularly when PTD is at issue.
One of the most enduring (though not often explicitly stated) misconceptions about PTD is that once it is granted, the recipient must thereafter remain virtually housebound. This is a fallacy. PTD exempts no one from life's daily demands. Groceries must be purchased and meals cooked. Errands must be run and appointments kept. The yard must be tended and the dog walked. Where children are involved, there may be significant chauffeur time. For some, family and friends shoulder much of the burden. Others, on the other hand, lack such support, leaving the onus of these chores on the PTD claimant.
These simple activities can nevertheless often generate considerable controversy. That is because all of these tasks are potentially remunerative. From the school cafeteria to the four-star restaurant, people are paid to prepare meals. People are paid for lawn and child care. Many people earn their living behind the wheel. State ex rel. Parma Comm. Gen. Hosp. v.Jankowski, 95 Ohio St.3d 340, 2002-Ohio-2336, * * * acknowledged this and cautioned against an automatic disqualification from compensation based on the performance of routine tasks, regardless of their potential for payment. * * *
(Emphasis sic.)
 {¶ 41} Analysis begins with scrutiny of the SHO's order.
 {¶ 42} Of the three criteria listed by the Lawson court where PTD is inappropriate, Lawson at ¶ 16, the SHO seems to have premised his determination that relator has been capable of sustained remunerative employment as of May 12, 1998, solely onLawson's third criteria — activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award.
 {¶ 43} Preliminarily, the magistrate observes that the SHO's order fails to find that relator was actually engaged in sustained remunerative employment. If the SHO did not find that relator had actually engaged in sustained remunerative employment, why did he specify in his order the remuneration relator received for the years 1998 through 2004?
 {¶ 44} The answer to the above question may lie within the record before this court. As the commission points out in its brief, relator worked as a telephone book distributor for the following periods of time that correspond to the earnings of record.
Time period of work Earnings
 5/12/98 to 8/25/98 $3,285.67 5/11/99 to 8/24/99 $3,387.51 5/9/00 to 8/22/00 $3,403.92 5/10/01 to 8/14/01 $3,483.36 7/9/02 to 9/24/02 $4,423.00 7/3/03 to 9/11/03 $3,322.90 6/22/04 to 7/6/04 $2,849.48
 {¶ 45} As the above chart clearly shows, relator's work as a telephone book distributor was seasonal. The work generally lasted about three and one-half months. During that seasonal employment, relator earned slightly less than $1,000 per month with the exception of the 2002 season when he earned almost $1,000 more than his usual seasonal earnings.
 {¶ 46} Perhaps the SHO felt that the annual earnings could not be viewed as supporting actual sustained remunerative employment. In any event, this magistrate views the SHO's order as failing to contain a finding that relator was actually engaged in sustained remunerative employment even though relator undisputedly received remuneration for the seasonal work he performed as a telephone book distributor.
 {¶ 47} In the magistrate's view, the SHO's order can be upheld based on Lawson's third criteria — that relator's activities were so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award.
 {¶ 48} The commission's August 25, 1993 order indicates that the PTD award is based exclusively upon Dr. Zachary's June 20, 1991 report. There, Dr. Zachary opined "this patient should be considered permanently and totally disabled as a result of this condition." The commission's August 25, 1993 order concludes that "claimant is medically precluded from returning to the active workforce."
 {¶ 49} Ohio Adm. Code 4121-3-34(B)(2)(b) states:
(b) "Light work" means exerting up to twenty pounds of force occasionally, and/or up to ten pounds of force frequently, and/or a negligible amount of force constantly (constantly: activity or condition exists two-thirds or more of the time) to move objects. Physical demand may be only a negligible amount, a job should be rated light work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling or arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.
 {¶ 50} As indicated earlier, when asked what type of lifting was involved with relator's job, Speck stated to agents Cronig and Mergen that a bundle of phone books weighs about 20 to 30 pounds and the bundles would be loaded onto relator's truck. Speck also stated that each phone book weighs about four to five pounds when separated for delivery.
 {¶ 51} Corresponding to Speck's statement, the SHO states in his order: "The evidence on file indicates that claimant delivered the phone books and unloaded them from the truck in bundles weighing at least twenty pounds."
 {¶ 52} The SHO's order concludes:
* * * The 06/24/2004 video evidence shows claimant's ability to walk in a normal manner and drive a truck. The 06/25/2004 video evidence which was [a] surveillance tape done while claimant was unloading a pallet of phone books in bundles at a Bureau of Workers' Compensation office shows that claimant is physically capable of doing at least a light duty level of work which is inconsistent with his alleged ongoing request for permanent and total disability com-pensation.
 {¶ 53} The SHO's order refers to two videos that were not submitted to this court for review. On June 24, 2004, SIU agents videoed relator arriving at the facility where the phone books were to be loaded onto relator's truck. Relator was videoed as he maneuvered his truck, he walked in the parking lot, opened the rear of the truck, entered and exited the building, and as he reentered his truck.
 {¶ 54} On June 25, 2004, relator was videoed by a bureau security camera while he was delivering telephone books to the bureau's Garfield Heights service office. According to the SHO's order, the June 25, 2004 video shows relator unloading a pallet of phone books in bundles at the bureau office.
 {¶ 55} After reviewing the two videos, the SHO concluded that relator had demonstrated that he is physically capable of doing at least "light duty level of work."
 {¶ 56} In the absence of the two videos to review, this magistrate has no cause to disagree with the SHO's observation that the two videos show relator to be physically capable of at least light work within the definition of Ohio Adm. Code4121-3-34(B)(2)(b).
 {¶ 57} Moreover, the record, as previously discussed, strongly corroborates the SHO's conclusion that relator demonstrates a physical capacity for light work.
 {¶ 58} From the videos of relator's activities during June 2004, and the surveillance evidence obtained during June and July 2004, the SHO inferred that relator was physically capable of light work as early as May 12, 1998, when he was first paid for delivering telephone books. Relator argues that this inference cannot be drawn. The magistrate disagrees.
 {¶ 59} That relator was paid $3,284.67 for work performed from May 12 to August 25, 1998, is indeed some evidence supporting an inference that the physical capabilities relator demonstrated during the June and July 2004 surveillance existed as early as May 1998.
 {¶ 60} Relator annually repeated his physical performance of telephone book delivery and was paid according to his distributor contract. The absence of surveillance evidence to support relator's physical capacities as early as May 1998 did not limit the commission's fact-finding discretion to determine that relator's physical capacities must have been commensurate with the jobs he performed for remuneration as early as May 1998.
 {¶ 61} Based upon the above analysis, the magistrate concludes that there is some evidence upon which the commission relied to support its finding that relator has been able to perform sustained remunerative employment as early as May 12, 1998.
 {¶ 62} As previously noted, the second issue is whether the commission abused its discretion in finding that the compensation was fraudulently obtained.
 {¶ 63} In Burr v. Stark Cty. Bd. of Commrs. (1986),23 Ohio St.3d 69, 73, the court sets forth the elements of fraud:
"`(a) a representation or, where there is a duty to disclose, concealment of a fact,
"`(b) which is material to the transaction at hand,
"`(c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
"`(d) with the intent of misleading another into relying upon it,
"`(e) justifiable reliance upon the representation or con-cealment, and
"`(f) a resulting injury proximately caused by the reliance.' * * *"
 {¶ 64} Here, relator claims that the SHO's order "fails to demonstrate that Dobies acted falsely with the intent to mislead." (Relator's brief, at 15.) The magistrate disagrees.
 {¶ 65} The evidence of record undisputedly shows that relator was paid by Product Development Corporation for telephone book delivery by checks payable to the order of K.F. Dobies who is relator's spouse (Karen F. Dobies). Beginning with the first payment by check dated May 12, 1998, relator has been paid by check issued in the name of his spouse.
 {¶ 66} The record also contains multiple distributor contracts wherein K.F. Dobies is the alleged applicant for a distributor contract and the social security number of relator's spouse is listed.
 {¶ 67} The above-mentioned documents support Speck's statements during his interview. Speck's statements clearly indicate that relator misrepresented his own identity and name to Product Development Corporation in all the years that he worked for that company.
 {¶ 68} In his order, the SHO correctly concluded:
* * * [C]laimant misrepresented himself to Terry Speck as being "K.F. Dobies" and used an erroneous social security number. The Staff Hearing Officer finds that the Bureau of Workers' Compensation paid claimant permanent and total disability compensation between 1998 and the present based upon a reliance upon claimant's misrepresentations and concealments.
 {¶ 69} Relator's misrepresentation or concealment of his true identity in applying for distributor contracts with Product Development Corporation is some evidence, if not compelling evidence, that relator acted with the intent of concealing from the bureau that he was employed while receiving PTD compensation. Thus, contrary to relator's claim here, the commission rendered a specific finding that supports a fraudulent intent.
 {¶ 70} Moreover, as the SHO correctly found, relator completed and returned the so-called PTD questionnaire dated January 6, 1998, but failed to complete and return the questionnaires for subsequent years. Obviously, the first questionnaire predates relator's first seasonal employment as a telephone book distributor, while the subsequent questionnaires that relator failed to return postdate relator's first seasonal employment. It was clearly within the SHO's fact-finding discretion to view the questionnaires as evidence of a deliberate concealment of relator's employment.
 {¶ 71} Based upon the foregoing analysis, relator has failed to show that the commission abused its discretion in finding that the compensation was fraudulently obtained.
 {¶ 72} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.