DECISION
{¶ 1} Relator, Robert Lowe ("relator"), filed this action seeking a writ of mandamus directing respondent, the Industrial Commission of Ohio ("respondent" or "the commission"), to vacate its order terminating permanent total disability ("PTD") *Page 2 
compensation effective September 5, 2006, and to enter an order reinstating PTD compensation.
 {¶ 2} We referred this case to a magistrate of this court pursuant to Loc. R. 12(M) and Civ. R. 53. On May 7, 2008, the magistrate issued a decision denying the writ of mandamus. Relator filed objections, and respondent filed a memorandum contra to the objections. For the reasons that follow, we overrule relator's objections and adopt the magistrate's decision.
 {¶ 3} To summarize the facts of this case, which are amply set forth in the magistrate's decision, relator injured his shoulder while employed with respondent, Cincinnati, Inc. ("employer"), a self-insured employer under Ohio workers' compensation laws. Relator's claim is allowed for strain/sprain left shoulder, rotator cuff tear, and aggravation of pre-existing arthritis of left glenohumeral joint. Relator has undergone five shoulder surgeries, with the last surgery being a total joint arthroplasty of the left shoulder.
 {¶ 4} Relator filed an application seeking PTD compensation on January 29, 2003. After a hearing, a staff hearing officer ("SHO") issued an order granting relator's application effective September 27, 2002. The employer's request for reconsideration of the SHO order was denied. We denied the employer's request for a writ of mandamus seeking vacation of the order awarding PTD compensation. State ex rel. Cincinnati, Inc. v.Lowe, Franklin App. No. 04AP-241, 2005-Ohio-516. The Supreme Court of Ohio affirmed. State ex rel. Cincinnati, Inc. v. Lowe,109 Ohio St.3d 80, 2006-Ohio-1927, 846 N.E.2d 25.
 {¶ 5} On November 1, 2005, the employer moved to terminate PTD compensation and for a declaration of overpayment. In support of this motion, the *Page 3 
employer offered videotapes of surveillance conducted on relator on August 3, 2004 and June 25, 2005. The videotape shows relator using a power mower, using a hedge trimmer with both his right and left arms, and holding the trimmer in his left hand while using a rake with his right arm to scrape cuttings off the trimmer.
 {¶ 6} On October 5, 2005, Bernard B. Bacevich, M.D., reviewed the videotape at the employer's request. Dr. Bacevich had examined relator in 2003 as part of the initial application for PTD compensation, and had reported as his opinion that relator was capable of engaging in sustained remunerative employment at that time performing sedentary work using only his right arm. Upon his review of the videotape, Dr. Bacevich prepared an additional report stating his opinion that the videotape showed that relator had capabilities beyond that which had been shown in his 2003 examination, and that relator was capable of engaging in sustained remunerative employment performing light to medium work.
 {¶ 7} On January 3, 2006, an SHO issued an interlocutory order finding that the videotape evidence offered by the employer was sufficient to demonstrate the possibility that there had been a change in circumstances that could warrant termination of PTD compensation. The SHO ordered an examination to include both a physical examination and a review of the videotaped evidence. That examination was conducted on May 12, 2006, by Andrew Freeman, M.D. Dr. Freeman concluded that the conditions allowed in the claim had reached maximum medical improvement ("MMI"), and that relator was capable of performing sedentary work with no reaching or overhead work using his left arm. *Page 4 
 {¶ 8} After a September 5, 2006 hearing, an SHO issued an order granting the employer's motion to terminate PTD compensation. PTD compensation was terminated as of the date of the hearing, and no overpayment was declared. The SHO concluded that the videotape evidence was sufficient to find that a change in circumstances had occurred since the time of the PTD compensation finding, and that the videotape showed that relator had greater functional capacity than he had testified at the original hearing. The SHO then concluded that relator was capable of sustained remunerative employment, and thus termination of PTD compensation was warranted. On April 6, 2007, the commission, by a 2-1 vote, denied relator's request for reconsideration of the SHO's order. Relator then filed this action.
 {¶ 9} In his decision, the magistrate concluded that the commission did not abuse its discretion in finding: (1) that a change in circumstances had occurred justifying the commission's exercise of continuing jurisdiction over relator's PTD claim, and (2) that based on the evidence, relator's PTD compensation should be terminated. Relator's objections to the magistrate's decision relate to the finding that a change in circumstances had occurred that allowed the commission to exercise continuing jurisdiction.
 {¶ 10} The requirements for the commission to exercise continuing jurisdiction over a PTD claim are: (1) new and changed circumstances, (2) fraud, (3) clear mistake of fact, (4) clear mistake of law, or (5) error by an inferior tribunal. State ex rel. Gobich v. Indus.Comm., 103 Ohio St.3d 585, 2004-Ohio-5990, 817 N.E.2d 398. Evidence arising after a PTD award that a claimant is engaged or can engage in sustained remunerative employment is a new and changed circumstance that can justify the commission's *Page 5 
exercise of continuing jurisdiction. State ex rel. Alesci v. Indus.Comm., 97 Ohio St.3d 210, 2002-Ohio-5932, 777 N.E.2d 835.
 {¶ 11} Evidence that a claimant is capable of sustained remunerative employment such that continued payment of PTD compensation is not appropriate includes: (1) actual sustained remunerative employment, (2) the physical ability to perform sustained remunerative employment, or (3) activities so medically inconsistent with the disability evidence that they impeach the medical evidence underlying the award. State exrel. Lawson v. Mondie Forge, 104 Ohio St.3d 39, 2004-Ohio-6086,817 N.E.2d 880.
 {¶ 12} The magistrate concluded that the commission's finding was based on the third factor in Lawson — that the evidence from the videotape was so medically inconsistent with the evidence offered in support of the initial PTD award as to impeach the credibility of the medical evidence underlying the award. The magistrate examined the SHO's order, in which the SHO cited evidence that had been provided in support of the initial PTD award, specifically relator's testimony that the pain he was experiencing was so severe that it interfered with his ability to ambulate, and that he required assistance with activities of daily living, including dressing and feeding. The SHO's order then discussed the videotape evidence and concluded that it showed that relator was not suffering from pain so severe that it interfered with his ambulation and with his ability to perform activities of daily living. Thus, the magistrate concluded that the SHO order properly cited some evidence to support the conclusion that a change in circumstances had occurred that justified the commission's exercise of continuing jurisdiction.
 {¶ 13} In his objections, relator disagrees with the magistrate's conclusion that the videotape evidence showed change circumstances supporting the exercise of continuing *Page 6 
jurisdiction. Relator argues that the activities shown on the videotape were within the medical restrictions that had been placed on him by his physician, and therefore could not form the basis for the conclusion that a change in circumstances had occurred. See, e.g., Lawson, supra, in which the court held that surveillance showing a claimant engaging in limited activities that were arguably inconsistent with his medical restrictions was not sufficient to terminate PTD compensation.
 {¶ 14} However, the magistrate's decision was not based on the conclusion that the videotape evidence showed relator engaging in activities that were inconsistent with his medical restrictions. Rather, the magistrate's decision was based on the conclusion that the videotape showed relator engaging in activities that were inconsistent with his testimony in support of his initial claim for PTD compensation, in which he testified that he was experiencing pain so severe that it interfered with his ambulation and with his performance of activities of daily living. Having reviewed the evidence, we agree with the magistrate's decision that there was some evidence to support the conclusion that there had been a change in circumstances justifying the commission's exercise of continuing jurisdiction.
 {¶ 15} Consequently, having considered relator's objections, and having
independently reviewed the magistrate's decision, we overrule relator's objections to the
magistrate's decision, and adopt the magistrate's decision as our own.
Objections overruled; writ denied.
 BRYANT and BROWN, JJ., concur. *Page 7 
 APPENDIX A MAGISTRATE'S DECISION
Rendered on May 7, 2008
 {¶ 16} In this original action, relator, Robert Lowe, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order *Page 8 
terminating permanent total disability ("PTD") compensation effective September 5, 2006, and to enter an order reinstating PTD compensation.
Findings of Fact: {¶ 17} 1. On November 13, 1998, relator injured his left shoulder while employed as a "laser assembler" for respondent Cincinnati, Inc. ("employer"), a self-insured employer under Ohio's workers' compensation laws.
 {¶ 18} 2. The industrial claim is allowed for "strain/sprain left shoulder; rotator cuff tear; aggravation of pre-existing arthritis of left glenohumeral joint," and is assigned claim number 98-593871.
 {¶ 19} 3. Relator has undergone five left shoulder surgeries. The first four surgeries were performed by orthopedic surgeon Jim Swanson, M.D. The fifth surgery was a total joint arthroplasty of the left shoulder performed on August 21, 2001, by a Dr. Kim.
 {¶ 20} 4. On September 27, 2002, relator was seen and examined by Dr. Swanson who took over relator's care after Dr. Kim moved to a new location.
 {¶ 21} 5. In his September 27, 2002 office note, Dr. Swanson stated:
 The left shoulder continues to be painful and stiff despite the arthroplasty. * * * Mr. Lowe doesn't feel he is capable of working with his shoulder. He can do a few light things around the house, but once he starts anything involving repetition or lifting his pain worsens. He still uses pain medicine intermittently. * * *
 * * *
 * * * HE MEETS THE CRITERIA OF CHRONIC INTRACTABLE PAIN REQUIRING NARCOTICS FOR CONTROL. * * * *Page 9 
 I do not recommend ever returning to work. MMI status has been achieved effective 9-27-02. 28% Upper Extremity Permanent Partial Impairment is present according to the AMA Guides to Impairment, 5th edition. (Equivalent to 17% whole person). * * * He will require twice yearly visits to me to refill pain medication and monitor for signs of prosthetic loosening or infection. The total joint will need to be routinely followed with yearly x-rays of the shoulder.
(Emphasis sic.)
 {¶ 22} 6. On January 29, 2003, relator filed an application for PTD compensation. In support, relator submitted Dr. Swanson's September 27, 2002 office note.
 {¶ 23} 7. On April 30, 2003, at the employer's request, relator was examined by
Bernard B. Bacevich, M.D., who reported:
 It is my opinion that the allowed conditions in this claim do not preclude this man from engaging in any sustained remunerative employment. It is my opinion that this man is capable of performing work in a sedentary level but only with use of his right arm. It is my opinion that he has to be in a position where he does not use his left arm. * * *
 Based upon the Fifth Edition of the AMA Guides to the Evaluation of Permanent Impairment. This man would have a 47% impairment of the left shoulder which equates to a 28% impairment of the whole person. * * *
 {¶ 24} 8. On May 15, 2003, at the commission's request, relator was examined by Steven S. Wunder, M.D., who reported:
 Based upon the AMA Guides to the Evaluation of Permanent Improvement [sic], fourth edition, for the diagnoses of left shoulder sprain/strain, rotator cuff tear, and aggravation of pre-existing arthritis of the left glenohumeral joint, he would have a 27% impairment to the whole person. The rationale behind this would be a 22% upper extremity impairment from the range of motion tables. The range of motion was less than noted by Dr. Swanson, but I could not tell if this was due to pain or more contractures since his last visit. He would have a 30% upper extremity impairment from Table *Page 10 
27, page 61 for an implant arthroplasty. The 30% combines with the 22% using the Combined Values Table for a 45% upper extremity impairment, which equates to a 27% impairment to the whole person.
 * * * He would have functional capacities using the right arm only in the realm of sedentary to light. He could use the left arm for no more than 2 to 3 pounds of lifting and primarily as a helper. He has no functional restrictions with the right arm, axial skeleton or lower extremities. * * *
 {¶ 25} 9. Dr. Wunder also completed the physical strength rating form on May 15, 2003. On the form, Dr. Wunder indicated that relator is capable of performing sedentary work.
 {¶ 26} 10. Following an October 1, 2003 hearing, a staff hearing officer ("SHO") issued an order granting PTD compensation starting September 27, 2002, the date of Dr. Swanson's office note. The SHO explained:
 The injured worker was examined by Dr. Wunder at the request of the Industrial Commission with respect to the allowed orthopedic conditions in the claim. Dr. Wunder opined that the injured worker has reached maximum medical improvement and has a resulting 27% whole person permanent impairment. Dr. Wunder completed a physical strength rating form which he attached to his medical report wherein he indicated that the injured worker is capable of physical work activity at a sedentary level.
 The employer submitted the medical report of Dr. Bacevich for consideration. Dr. Bacevich essentially agreed with the opinion of Dr. Wunder and opined that the injured worker has a 28% whole person permanent impairment considering the allowed conditions. He also opined that the injured worker would be capable of performing sedentary employment provided that he not perform any work activity with the left upper extremity.
 The injured worker testified at hearing that he continues to suffer from pain despite four surgical procedures on his left shoulder. The injured worker testified that the pain that he experiences is so severe that it interferes with his ability to *Page 11 
ambulate as well as his ability to concentrate. The injured worker further testified that he is unable to take care of his activities of daily living and needs help from his wife in dressing and feeding. The injured worker further testified that he attempted a return to work in July, 2002 as a security guard, but was unable to continue to perform the job duties as a result of his difficulty with walking and pain.
 The injured worker submitted the office notes of his treating physician, Dr. Swanson, for consideration. Dr. Swanson opined on 09/27/2002 that the injured worker is unable to perform employment as a result of the allowed conditions.
 The Staff Hearing Officer finds that the injured worker is unable to return to his former position of employment and is incapable of engaging in any other form of sustained remunerative employment considering the severity of his medical impairment in combination with the resulting pain from which he suffers as a result of the allowed conditions. Therefore, the injured worker's application for permanent and total disability compensation is granted.
 This order is based on the office note of Dr. Swanson dated 09/27/2002 and the injured worker's testimony at hearing.
 {¶ 27} 11. On December 17, 2003, the commission mailed an order denying the employer's request for reconsideration of the SHO's order of October 1, 2003.
 {¶ 28} 12. On November 1, 2005, the employer moved to terminate PTD compensation and for a declaration of an overpayment beginning August 3, 2004. In support of its motion, the employer submitted surveillance videotapes of relator performing yard work at his residence on August 3, 2004 and June 25, 2005.
 {¶ 29} 13. Earlier, on October 5, 2005, at the employer's request, Dr. Bacevich reviewed the videotaped evidence and issued an "Addendum Report," stating:
 I had initially performed an Independent Medical Examination on Robert Lowe on April 30, 2003 and have now been sent a videotape of Robert Lowe dated 08/03/04 and 06/25/05. My review of the videotape shows that on 08/03/04 he was at an ATM machine and then walked over to his car *Page 12 
but could easily open and close the door using his left arm. The tape then showed him using a power mower which had to be pushed and pulled and he was using this with both arms, again without any visible signs of difficulty in using his arms. He would push and pull this repetitively, move it around trees, and not show any evidence of difficulty. At times he would use a single arm and pull the mower backwards with his right arm but he would be swinging his left arm, again, without any evidence of difficulty. At the end of the grass cutting session he did put his mower away in to a garage area. He appeared to be very hot and sweaty. The video ended when he walked up and was talking with an older man and went down to sit on a porch. The next section of the video was from 06/25/05 when it begins with him picking up a hedge clipper with his left arm and not showing any signs of difficulty. The video, at times, would show him using the hedge cutter with his right arm and other times he would use it in both arms. He would then use a rake to clear the debris from the top of the bushes. He would have his right arm at the proximal part of the handle and his left arm down lower and would be pulling backwards quite forcefully and vigorously and, again, this showed no evidence of any difficulty or pain. During these maneuvers his left arm would be raised forward to the 90-degree position. At other times, he was seen holding the trimmer in his left arm using the rake in his right arm to scrape off the cuttings and other times he would use both arms on the rake. There were several episodes where he could easily pick up the hedge clippers with his left arm. During all of these movements [t]here is no evidence to indicate that he was experiencing pain. This video demonstrated that he had full normal motion of the shoulder in various positions with the arm at or below shoulder level. The video did not demonstrate any activities where he had to reach in the completely overhead position.
 SUMMARY AND OPINIONS:
 Based upon reviewing this video, this man demonstrated physical capabilities that were much different than the * * * findings on my examination on April 30, 2003. On my examination he had exquisite pain in the shoulder on attempts at range of motion and had very severe guarding. His pain was also aggravated by even bending the elbow whereas in the video he did not have any apparent difficulty with the shoulder even with bending activities at the elbow, *Page 13 
lifting a hedge clipper, or using a hedge clipper or a rake. Based upon review of this video, this man has either had a miraculous recovery between 04/30/03 and the first portion of the video dated 08/03/04 or that he was demonstrating marked symptom magnification during my examination. Based upon the recent video of 06/25/05, this man can certainly use his left arm for many activities which are fairly strenuous in that he could use it for pushing and pulling a lawn mower and also use it in cutting hedges and using a rake. Based upon this video, it is certainly my opinion that this man is capable of gainful sustained remunerative employment and my opinions rendered in my report are no longer valid. This man is capable of using his left arm for repetitive activities certainly below the shoulder level. He is capable of cutting grass, capable of using a hedge trimmer, and capable of raking. This video does not support the fact that this man has been granted permanent total disability benefits. This man can perform light to medium work.
 {¶ 30} 14. On January 3, 2006, an SHO issued an interlocutory order stating:
 The Staff Hearing Officer finds that the employer has presented sufficient evidence to demonstrate that there may have been a change in circumstances sufficient to warrant the stopping of the Permanent and Total Disability award. Therefore[,] the Staff Hearing Officer refers the file to the medical section for an examination on the issue of whether the injured worker is capable of performing sustained remunerative employment. The examining physician is instructed to examine the injured worker and to review the video tape evidence submitted by the employer.
 After the completion of the examination[,] the matter is to be reset before a Staff Hearing Officer on the employer's motion filed 11/01/2005.
 {¶ 31} 15. On May 12, 2006, at the commission's request, relator was examined by Andrew Freeman, M.D., who reported:
 HISTORY OF PRESENT ILLNESS: * * *
 He is right-hand dominant. He is unlimited in terms of sitting and standing and walking, but he can only drive using his right hand only and only uses his left hand and arm to steady the wheel. He states that he can only lift 3 to 5 pounds with *Page 14 
 the left hand and arm and can lift up to 20 pounds with the right arm. He states that he is unable to do dishes, cook, and make a bed. This is because of his left shoulder symptoms. He is able to dress himself and perform personal hygiene tasks. At this point, he made a point of stating that he does have occasional days where he can do this such as the day when he was filmed without his knowledge in June of 2005.
 * * *
 PHYSCAL EXAMINATION:
 * * *
 LEFT SHOULDER: There was no visible swelling or deformity in the shoulder joint. The drop arm test could not be performed. There was diffuse tenderness over the AC joint, deltoid, biceps tendon insertion and all other areas tested in the shoulder region. There was mild crepitus with active motion. There was a 17 cm healed anterior scar from a prior shoulder surgery. The Jobe's test and the anterior drawer test could not be performed due to pain.
 * * *
 DISCUSSION: Robert Lowe has allowed conditions from a single claim being evaluated in this report. The left shoulder conditions are still symptomatic.
 OPINION: Based solely on the allowed conditions listed in the claims reviewed, and considering only the physical conditions allowed:
 1. These allowed conditions have reached MMI.
 2. Based on the American Medical Association's Guides to the Evaluation of Permanent Impairment — 5th Edition, the whole person impairment for the allowed physical conditions in the claim is 20%. * * *
 {¶ 32} 16. On May 12, 2006, Dr. Freeman completed a physical strength rating form. On the form, Dr. Freeman indicated that relator can perform "sedentary work." He added "no reaching or overhead work with the left arm." *Page 15 
 {¶ 33} 17. Following a September 5, 2006 hearing, an SHO issued an order granting the employer's November 1, 2005 motion to terminate PTD compensation to the extent that PTD compensation was terminated as of the September 5, 2006 hearing date and no overpayment was declared. The SHO's order explains:
 It is the order of the Staff Hearing Officer that the employer's motion, filed 11/01/2005, is granted. The employer's motion requests that the payment of permanent and total disability compensation be terminated due to a change in circumstances subsequent to the order granting permanent and total disability that demonstrate that the injured worker is capable of sustained remunerative employment.
 The Staff Hearing Officer finds that by Industrial Commission order dated 10/01/2003 the injured worker was awarded benefits for permanent and total disability. In granting permanent and total disability the Staff Hearing Officer stated:
 "The injured worker testified at hearing that he continues to suffer from pain despite four surgical procedures on his left shoulder. The injured worker testified that the pain that he experiences is so severe that it interferes with his ability to ambulate as well as his ability to concentrate. The injured worker further testified that he is unable to take care of his activities of daily living and needs help from his wife in dressing and feeding. The injured worker further testified that he attempted to return to work in July, 2002 as a security guard, but was unable to continue to perform the job duties as a result of his difficulty with walking and pain."
 The employer has submitted videotape evidence of the injured worker performing yard work outside of his home. The videotape evidence is compiled on two dates. The Staff Hearing Officer finds that the activities recorded on 06/25/2005 are the most compelling. The videotape on 06/25/2005 shows the injured worker using both arms and hands to trim bushes using hedge clippers. The videotape on that date also shows the injured worker using both hands and arms to hold a rake which he is rapidly and forcefully moving back and forth to remove debris from the tops of bushes. *Page 16 
 The Staff Hearing Officer finds that the videotape evidence is sufficient evidence to demonstrate that a change in circumstances has occurred since the time of the initial permanent and total disability finding. The original permanent and total disability order memorialized the injured worker's testimony that his pain is so severe that it interferes with his ability to ambulate. The order further recorded the injured worker's testimony that he is not able to take care of his activities of daily living and that the injured worker needs help from his wife in dressing and feeding. The Staff Hearing Officer finds that the videotape evidence clearly demonstrates that the allowed conditions in this claim would not so severely restrict the injured worker's functional capacity as to limit his abilities to participate in the activities of daily living or to prevent the injured worker from performing the activities of dressing and feeding. The Staff Hearing Officer finds that the Staff Hearing Officer relied upon the injured worker's testimony that he was not able to perform the activities of daily living, including dressing and feeding and that he had a limited ability to walk due to pain in finding that the injured worker was permanently and totally disabled. The Staff Hearing Officer finds that the videotape demonstrates that the injured worker's condition has changed since the original Permanent and Total Disability hearing and that the injured worker has greater functional capacities than he testified to at the original hearing.
 The Staff Hearing Officer therefore finds that the change in circumstances makes it appropriate to reconsider the issue of permanent and total disability in this claim.
 The employer submitted the 10/05/2005 report of Bernard Bacevich, orthopedic surgeon. Dr. Bacevich's report is an addendum report to his report dated 04/30/2003. Dr. Bacevich reviewed the videotape evidence compiled on 08/03/2004 and 06/25/2005. In his report[,] Dr. Bacevich recounts the activity viewed in the videotape. Dr. Bacevich advised that the video showed the injured worker walking, pushing and pulling a lawn mower, picking up a hedge clipper with the left arm, using the hedge clipper with the right arm or with both arms, using a rake to clear debris from the tops of bushes, and pulling backwards quite forcefully and vigorously. Dr. Bacevich advised that the injured worker performed these activities with no indication that he was experiencing pain. Dr. Bacevich opined, based upon the *Page 17 
video of 06/25/2005, that the injured worker can use his left arm for many activities which are fairly strenuous. He further opined, based upon the video, that the injured worker is capable of gainful sustained remunerative employment. Dr. Bacevich opined, based upon the video that the injured worker is capable of performing light to medium work.
 Dr. Andrew Freeman, occupational medicine, evaluated the injured worker on 05/12/2006 at the request of the Industrial Commission. Dr. Freeman reviewed medical evidence on file, took a history from the injured worker, examined the injured worker and reviewed the videotape evidence. Dr. Freeman noted that the injured worker is right hand dominant. The injured worker advised Dr. Freeman that he is unlimited in terms of sitting, standing and walking. The injured worker further advised that he is able to drive with his right hand, using his left hand and arm only to steady the wheel. He further advised that he is able to lift only three to five pounds with the left hand. The injured worker further advised that he is not able to do dishes, cook or make a bed because of his left shoulder symptoms. The injured worker further advised that [he] is able to dress himself and perform personal hygiene tasks.
 Dr. Freeman reviewed the 06/25/2005 videotape. Dr. Freeman advised that during the segment of video the injured worker was seen to use both hands to operate a hedge clipper; was seen to move both arms in a rapid fashion; was seen using a rake in his yard; and was seen to reach to connect and disconnect his hose. Dr. Freeman advised that the injured worker performed these activities with no physical evidence of pain such as grimacing. Dr. Freeman's examination findings are contained in his report. Dr. Freeman advised that the injured worker has reached maximum medical improvement for each of the conditions that are recognized in his industrial claim. On the physical strength rating form that is attached to his report[,] Dr. Freeman indicated that the injured worker is capable of sedentary work with no reaching or overhead work with the left arm.
 The Staff Hearing Officer finds the injured worker has reached maximum medical improvement for each of the conditions that are recognized in his industrial claim. The Staff Hearing Officer further finds, based upon the reports of *Page 18 
Dr. Bacevich and Dr. Freeman, that the injured worker retains the physical functional capacity to perform employment activities that are sedentary in nature.
 The Staff Hearing Officer finds that the injured worker is 60 years of age with a high school education and work history which involved employment as an assembler, a machine operator, an inspector and an administrative assistant. The Staff Hearing Officer further finds that the injured worker is able to read, write and perform basic math well. The Staff Hearing Officer further finds that the injured worker has no specialized training or special vocational skills.
 The Staff Hearing Officer finds that the injured worker's age of 60 years is a moderate barrier to the injured worker with regard to his ability to return to and compete in the work force. The Staff Hearing Officer further finds, however, that age alone is not a factor which absolutely prevents any person from returning to work. The Staff Hearing Officer further finds that the injured worker's high school education and ability to read, write and perform basic math well are assets to the injured worker with regard to his ability to return to work. The Staff Hearing Officer further finds that these same factors would be assets to the injured worker with regard to his ability to learn the new work skills, work rules and work procedures necessary to perform some other type of employment. The Staff Hearing Officer further finds that the injured worker's skilled work history, which involves employment as a machine builder and an extruder operator, is evidence that the injured worker has the intellectual capacity to learn to perform at least unskilled and semiskilled employment in the future. The Staff Hearing Officer further finds that the injured worker's twelfth grade education and ability to read, write and perform basic math well should provide the injured worker with academic levels that are sufficient for the performance of many entry level occupations. The Staff Hearing Officer, accepting the opinions of Dr. Bacevich and Dr. Freeman and relying upon the videotape evidence, finds that the injured worker retains the physical functional capacity to perform employment activities that are sedentary in nature with no reaching or overhead work with the left arm. The Staff Hearing Officer finds that the injured worker can perform employment activities which require exerting up to ten pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull *Page 19 
or otherwise move objects. The Staff Hearing Officer further finds that the injured worker is able to perform work which requires sitting most of the time but may involve walking or standing for brief periods of time as long as this work does not require reaching or overhead work with the left arm.
 The Staff Hearing Officer therefore finds that the injured worker is capable of performing sustained remunerative employment and is not permanently and totally disabled. The Staff Hearing Officer finds that facts and circumstances have changed since the 10/01/2003 [order] which awarded permanent and total disability. The Staff Hearing Officer finds that the injured worker is no longer permanently and totally disabled. Therefore[,] the payment of benefits for permanent and total disability, is terminated effective 09/05/2006, the date of this hearing.
 This order is based upon Industrial Commission order dated 10/01/2003, the report of Dr. Bacevich dated 10/05/2005, the report of Dr. Freeman dated 05/12/2006 and the videotape evidence on file.
 {¶ 34} 18. On April 6, 2007, the three-member commission, one member dissenting, mailed an order denying relator's request for reconsideration of the SHO's order of September 5, 2006.
 {¶ 35} 19. On October 16, 2007, relator, Robert Lowe, filed this mandamus action.
Conclusions of Law: {¶ 36} The main issue is whether the commission abused its discretion in finding a change of circumstances justifying the exercise of its continuing jurisdiction over its prior PTD award.
 {¶ 37} Finding that the commission did not abuse its discretion in finding a change of circumstances justifying the exercise of its continuing jurisdiction over its prior *Page 20 
PTD award, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 38} The lifetime nature of a PTD award does not mean that it is immune from later review. State ex rel. Smothers v. Mihm (1994),69 Ohio St.3d 566, 567-568. If, for example, the commission learns that the claimant is working or engaging in activity inconsistent with his PTD status, the commission can use its continuing jurisdiction under R.C. 4123.52 to reopen the matter. Id.
 {¶ 39} Continuing jurisdiction is not unlimited. Its prerequisites are: (1) new and changed circumstances; (2) fraud; (3) clear mistake of fact; (4) clear mistake of law; and (5) error by an inferior tribunal.State ex rel. Gobich v. Indus. Comm., 103 Ohio St.3d 585,2004-Ohio-5990.
 {¶ 40} Discovery of evidence subsequent to a PTD award that a claimant is or can engage in sustained remunerative employment is a new and changed circumstance warranting the exercise of continuing jurisdiction.State ex rel. Alesci v. Indus. Comm., 97 Ohio St.3d 210, 2002-Ohio-5932, citing Smothers.
 {¶ 41} In State ex rel. Lawson v. Mondie Forge, 104 Ohio St.3d 39, 41,2004-Ohio-6086, a case heavily discussed by the parties, the court states:
 PTD pivots on a single question: Is the claimant capable of sustained remunerative employment? State ex rel. Stephenson v. Indus. Comm. (1987), 31 Ohio St.3d 167, 31 OBR 369, 509 N.E.2d 946. Payment of PTD is inappropriate where there is evidence of (1) actual sustained remunerative employment, State ex rel. Kirby v. Indus. Comm., 97 Ohio St.3d 427, 2002-Ohio-6668, 780 N.E.2d 275; (2) the physical ability to do sustained remunerative employment, State ex rel. Schultz v. Indus. Comm., 96 Ohio St.3d 27, 2002-Ohio-3316, 770 N.E.2d 576; or (3) activities so medically inconsistent with the disability evidence that they impeach the *Page 21 
medical evidence underlying the award. See State ex rel. Timmerman Truss, Inc. v. Indus. Comm., 102 Ohio St.3d 244, 2004-Ohio-2589, 809 N.E.2d 15, ¶ 26.
Id. at ¶ 16. (Emphasis sic.)
 {¶ 42} Here, the commission's finding of a new and changed circumstance is premised upon Lawson's third criteria — that relator's activities disclosed by the videotaped evidence are so medically inconsistent with the relied upon disability evidence that they impeach the medical evidence underlying the PTD award.
 {¶ 43} The SHO's order of October 1, 2003 awards PTD compensation based upon a finding that the industrial injury alone prohibits a return to any sustained remunerative employment without reference to the nonmedical factors. See Ohio Adm. Code 4121-3-34(D)(2)(a). The SHO's order states reliance upon Dr. Swanson's September 27, 2002 office note and relator's hearing testimony.
 {¶ 44} In her order of September 5, 2006, the SHO found that the June 25, 2005 videotape impeaches relator's October 1, 2003 hearing testimony as memorialized by the SHO's order of October 1, 2003. The SHO quoted that portion of the SHO's order of October 1, 2003 that memorializes relator's hearing testimony that was found to have been impeached:
 "The injured worker testified at hearing that he continues to suffer from pain despite four surgical procedures on his left shoulder. The injured worker testified that the pain that he experiences is so severe that it interferes with his ability to ambulate as well as his ability to concentrate. The injured worker further testified that he is unable to take care of his activities of daily living and needs help from his wife in dressing and feeding. * * *" *Page 22 
 {¶ 45} Following the quotation, the SHO explains how the June 25, 2005 videotape impeaches relator's hearing testimony. The SHO found that the videotape shows that relator no longer suffers a pain so severe that it interferes with ambulation and he is no longer unable to perform activities of daily living such that he needs help from his wife in dressing and feeding. Thus, the SHO found a change of circumstances indicating relator now has greater functional capacities than he testified to at the original hearing.
 {¶ 46} The SHO's order of September 5, 2006 specifically identifies what the June 25, 2005 videotape shows that impeaches relator's testimony underlying the PTD award. The videotape shows relator "using both arms and hands to trim bushes using hedge clippers." It shows relator "using both hands and arms to hold a rake which he is rapidly and forcefully moving back and forth to remove debris from the tops of bushes."
 {¶ 47} Significantly, relator does not claim that the SHO's order of June 25, 2005 inaccurately describes what the videotape shows. Moreover, having independently reviewed the videotaped evidence, this magistrate finds that the SHO's order accurately describes what the videotape shows.
 {¶ 48} This magistrate concludes that the videotaped evidence is indeed some evidence supporting the SHO's finding that relator's hearing testimony is impeached by the videotaped evidence.
 {¶ 49} Contrary to what relator suggests here, concluding that the videotaped evidence impeaches relator's hearing testimony, thus giving rise to continuing jurisdiction, is not tantamount to stating that relator's performance of yard work is the *Page 23 
some evidence that relator is capable of performing sustained remunerative employment.
 {¶ 50} The videotaped evidence impeaching the underlying evidence supporting the PTD award gave the commission authority to have relator examined by Dr. Freeman to determine relator's current status.
 {¶ 51} Following the commission's finding of change of circumstances, it evaluated the current medical evidence and analyzed the nonmedical factors. Relying upon Dr. Bacevich's October 5, 2005 addendum report and Dr. Freeman's report, the SHO concluded that relator retains the physical functional capacity to perform sedentary work. Parenthetically, this finding contrasts with the commission's previous finding that the industrial injury alone produced PTD. The commission then analyzed the non-medical factors.
 {¶ 52} Other than his challenge to the exercise of continuing jurisdiction, relator does not challenge here the commission's determination of his current PTD status, i.e., its reliance upon the October 5, 2005 report of Dr. Bacevich and the May 12, 2006 report of Dr. Freeman. Nor does relator challenge the commission's analysis of the non-medical factors in determining current PTD status. Clearly, the commission's continuing jurisdiction gave it authority to adjudicate relator's current status resulting in the termination of PTD compensation effective the date of the hearing.
 {¶ 53} While the Lawson case explains many of the legal concepts pertinent here, relator's reliance upon Lawson to compel a writ of mandamus is misplaced.
 {¶ 54} In Lawson, Donald E. Lawson was awarded PTD effective in 1994 after the commission concluded that the low-stress sedentary jobs to which his conditions *Page 24 
limited him were foreclosed to anyone with his lack of skills and education. Thereafter, in 2001, the Ohio Bureau of Workers' Compensation ("bureau") conducted an investigation which produced an "activity spreadsheet" that contained 207 activities engaged in by Lawson from 1993 through 2001. The bureau also produced video surveillance.
 {¶ 55} In Lawson, the court observed that none of the 207 confirmed activities on the activity spreadsheet contain sufficient information to conclusively establish that any of them conflicted with Lawson's restrictions. Id. at ¶ 24.
 {¶ 56} While the predominant activity on the spreadsheet was refuse disposal, there was no evidence that Lawson did anything other than drive a truck — an activity within his sedentary restrictions.
 {¶ 57} Regarding the videotape, surveillance log, and resident affidavits, while that evidence did show some activity inconsistent with Lawson's medical restrictions, it was deemed irrelevant by the court absent evidence that Lawson could do it on a sustained basis. Id. at ¶ 27.
 {¶ 58} The Lawson court was also critical of Dr. Dunkin's report that was premised upon Lawson's activities on two days demonstrating some physical activity inconsistent with his medical restrictions. The court found that the activity did not equate to establishing Lawson's ability to do so on a sustained basis.
 {¶ 59} Given the court's conclusion that the evidence failed to show that Lawson engaged in significant activity inconsistent with his medical restrictions, the Lawson court issued a writ of mandamus ordering the commission to reinstate Lawson's PTD award. *Page 25 
 {¶ 60} Two things distinguish this case from the Lawson case: (1) the commission's initial determination that the industrial injury prohibits all sustained remunerative employment, and (2) the commission's reliance upon relator's hearing testimony. Of the two, relator's hearing testimony, as memorialized in the order, is the most significant.
 {¶ 61} Apparently, it was relator's hearing testimony that persuaded the commission to rely upon Dr. Swanson's September 27, 2002 opinion that relator was precluded from any sustained remunerative employment and to reject the reports of Drs. Wunder and Bacevich who opined that relator was capable of sedentary employment. That is, relator's hearing testimony that his pain interfered with ambulation and that he was unable to perform activities of daily living without assistance from his wife persuaded the commission to rely upon Dr. Swanson's opinion that the industrial injury precludes all sustained remunerative employment.
 {¶ 62} In Lawson, the issue for the court was whether the listed spreadsheet activities were inconsistent with the underlying medical determination that Lawson was medically able to perform sedentary employment. Here, the issue is whether the videotaped evidence shows activity inconsistent with relator's testimony that his pain interferes with ambulation and that he is unable to perform activities of daily living. That is, relator's claim to PTD status is premised upon alleged restrictions much greater in severity than the sedentary limitations sustained by Lawson. *Page 26 
 {¶ 63} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1