THE STATE EX REL. LOWE, APPELLANT, *v.* CINCINNATI, INC. ET AL.,

APPELLEES.

[Cite as *State ex rel. Lowe v. Cincinnati, Inc.,*

**124 Ohio St.3d 204, 2009-Ohio-5864.**]

*Workers' compensation — Exercise of continuing jurisdiction — Abuse-of-discretion standard — New and changed circumstances — "Some evidence" supported the commission's decision — Judgment affirmed.*

(No. 2008-1954 — Submitted September 1, 2009 — Decided

November 12, 2009.)

APPEAL from the Court of Appeals for Franklin County, No. 07AP-850,

2008-Ohio-4891.

_____

**Per Curiam**.

{¶ 1} Appellant, Robert Lowe, challenges the termination of his permanent total disability benefits by appellee Industrial Commission of Ohio. Lowe injured his left shoulder in 1998 while working for appellee Cincinnati, Inc. In 2003, he was awarded permanent total disability compensation beginning in September 2002. The order discussed Lowe's testimony at length:

{¶ 2} "The injured worker testified at hearing that he continues to suffer from pain despite four surgical procedures on his left shoulder. The injured worker testified that the pain that he experiences is so severe that it interferes with his ability to ambulate as well as his ability to concentrate. The injured worker further testified that he is unable to take care of his activities of daily living and needs help from his wife in dressing and feeding."

{¶ 3} In October 2005, Cincinnati, Inc. moved to terminate permanent total disability based on "new and changed circumstances that have occurred

subsequent to the initial order that show [Lowe] is capable of sustained remunerative employment." The motion included a surveillance video that showed Lowe engaged in vigorous yard work. It also included an October 5, 2005 medical report by Dr. Bernard Bacevich, who had examined Lowe in 2003 in connection with his initial request for permanent total disability benefits. In his 2005 report, Dr. Bacevich made these observations from the surveillance tape:

{¶ 4} "The [August 2004 section of the] tape then showed [Lowe] using a power mower which had to be pushed and pulled and he was using this with both arms; again without any visible signs of difficulty in using his arms. He would push and pull this repetitively, move it around trees and not show any evidence of difficulty. At times he would use a single arm and pull the mower backwards with his right arm, but he would be swinging his left arm, again, without any evidence of difficulty. * * * The next section of the video was from 06/25/05 when it begins with him picking up a hedge clipper with his left arm and not showing any signs of difficulty. The video, at times, would show him using the hedge cutter with his right arm and other times he would use it in both arms. He would then use a rake to clear the debris from the top of the bushes. He would have his right arm at the proximal part of the handle and his left arm down lower and would be pulling backwards quite forcefully and vigorously and, again, this showed no evidence of any difficulty or pain. During these maneuvers his left arm would be raised forward to the 90-degree position. At other times, he was seen holding the trimmer in his left arm[,] using the rake in his right arm to scrape off the cuttings and other times he would use both arms on the rake. There were several episodes where he could easily pick up the hedge clippers with his left arm. During all of these movements[,] [t]here is no evidence to indicate that he was experiencing pain. This video demonstrated that he had full normal motion of the shoulder in various positions with the arm at or below shoulder level."

{¶ 5} The doctor concluded:

**{¶ 6}** "Based upon reviewing this video, this man demonstrated physical capabilities that were much different than the findings on my examination on April 30, 2003. On my examination he had exquisite pain in the shoulder on attempts at range of motion and had very severe guarding. His pain was also aggravated by even bending the elbow whereas in the video he did not have any apparent difficulty with the shoulder even with bending activities at the elbow, lifting a hedge clipper, or using a hedge clipper or a rake. Based upon review of this video, this man has either had a miraculous recovery between 04/30/03 and the first portion of the video dated 08/03/04, or that he was demonstrating marked symptom magnification during my examination. Based upon the recent video of 06/25/05, this man can certainly use his left arm for many activities which are fairly strenuous in that he could use it for pushing and pulling a lawn mower and also use it in cutting hedges and using a rake. Based upon this video, it is certainly my opinion that this man is capable of gainful sustained remunerative employment and my opinions rendered in my [2003] report are no longer valid. The man is capable of using his left arm for repetitive activities certainly below the shoulder level. He is capable of cutting grass, capable of using a hedge trimmer, and capable of raking. This video does not support the fact that this man has been granted permanent total disability benefits. This man can perform light to medium work."

**{¶ 7}** The commission could not reopen the issue of Lowe's permanent total disability eligibility unless it first determined that the exercise of continuing jurisdiction was appropriate. The commission made that determination on January 18, 2006:

**{¶ 8}** "[T]he employer has presented sufficient evidence to demonstrate that there may have been a change in circumstances sufficient to warrant the stopping of the Permanent and Total Disability award. Therefore the Staff Hearing Officer refers the file to the medical section for an examination on the

issue of whether the injured worker is capable of performing sustained remunerative employment. The examining physician is instructed to examine the injured worker and to review the video tape evidence submitted by the employer."

{¶ 9}  Dr. Andrew Freeman performed this examination and made these observations from the videotape:

{¶ 10}  "This videotape shows [Mr. Lowe] walking around a yard using a hedge clipper.  During this approximately 10 minute segment of video[,] Mr. Lowe is seen to use both hands to operate a hedge clipper.  He is seen to move both arms in a rapid fashion.  There is no physical evidence of pain such as grimacing.  Mr. Lowe is seen to move the hedge clipper, use a rake in his yard, and reach to connect and disconnect his hose.  He also moves the hose during this period of time.  His range of motion in the left shoulder is observed to be at least 30 degrees of extension, at least 20 degrees of adduction, at least 90 degrees of abduction, and at least 100 degrees of forward flexion.  He is observed at one point during the video to throw a hose with his left arm rapidly going from a point of 0 degrees of forward flexion to 100 degrees of forward flexion in the active tossing of the hose."

{¶ 11} Dr. Freeman then detailed his physical findings and reported that the left shoulder was still symptomatic.  He stated that Lowe's conditions had reached maximum medical improvement and that Lowe had a 20 percent permanent impairment. Dr. Freeman concluded that Lowe was medically capable of sedentary work, with a prohibition against reaching or overhead work with the left arm.

{¶ 12} On September 5, 2006, a staff hearing officer issued a detailed order that terminated Lowe's permanent total disability benefits.  The order first affirmed the presence of new and changed circumstances sufficient to reopen the issue of permanent total disability eligibility.  The staff hearing officer noted that the original grant of permanent total disability relied heavily on Lowe's testimony

concerning the physical limitations his injury imposed. The staff hearing officer then discussed the videotape in depth and concluded that the "injured worker has greater functional capacities than he testified to at the original hearing."

{¶ 13} The staff hearing officer discussed the reports of Drs. Freeman and Bacevich and concluded that Lowe was medically capable of sedentary sustained remunerative employment. Lowe's nonmedical disability factors were reviewed and the staff hearing officer determined that they did not disqualify Lowe from sedentary work. Accordingly, permanent total disability compensation was stopped.

{¶ 14} After further reconsideration was denied, Lowe turned to the Court of Appeals for Franklin County, seeking a writ of mandamus to compel the commission to reinstate his permanent total disability compensation. The court of appeals denied the requested writ of mandamus after determining that the commission's order was supported by "some evidence." *State ex rel. Lowe v. Cincinnati, Inc.,* Franklin App. No. 07AP-850, 2008-Ohio-4891, ¶ 14.

{¶ 15} Lowe has now appealed to this court as of right.

{¶ 16} Lowe challenges the commission's continuing jurisdiction to reopen his permanent total disability eligibility, as well as the evidence underlying its decision to stop his compensation. Neither challenge has merit.

**Continuing Jurisdiction**

{¶ 17} The commission's continuing jurisdiction to reconsider compensation eligibility is not unlimited and can be invoked only where there is evidence of "(1) new and changed circumstances, (2) fraud, (3) clear mistake of fact, (4) clear mistake of law, or (5) error by an inferior tribunal." *State ex rel. Nicholls v. Indus. Comm.* (1998), 81 Ohio St.3d 454, 459, 692 N.E.2d 188. If the commission determines that it has continuing jurisdiction to revisit an issue, its order must state, in a clear and meaningful fashion, the basis upon which

5

continuing jurisdiction is being invoked. Id. The parties debate whether the January 3, 2006 staff hearing officer order satisfies this requirement.

{¶ 18} *Nicholls* was the first case to address this issue. *Nicholls* arose from a commission order that granted reconsideration of a permanent total disability award "based on the possibility of error" in the original permanent total disability order. Id. at 456. When the commission later vacated the award, the claimant filed an original action in this court, contesting the commission's authority to reconsider his permanent total disability award. We held that the order granting reconsideration was fatally defective:

{¶ 19} "None of these [five continuing jurisdiction] prerequisites exists here. Again, there has been no allegation of new and changed circumstances or fraud. There is also no *clear* error of any kind. The reconsideration order cites only the *possibility* of error, and an unspecified error at that.

{¶ 20} "Our approval of the staff hearing officer's order on reconsideration would effectively give the commission unrestricted jurisdiction. Error is always possible, and its existence cannot be refuted when the commission is not made to reveal what the perceived error is. We find, therefore, that the mere possibility of unspecified error cannot sustain the invocation of continuing jurisdiction." (Emphasis sic.) Id. at 459, 692 N.E.2d 188.

{¶ 21} We expanded on *Nicholls* in *State ex rel. Foster v. Indus. Comm.* (1999), 85 Ohio St.3d 320, 707 N.E.2d 1122. There, an employer's motion for reconsideration of permanent total disability was granted based on "probative evidence of a clear mistake of fact and of law in the order from which reconsideration is sought." We found this explanation, upon review, to be inadequate:

{¶ 22} "In this case, the commission abandoned conjecture and found that there was error. But, again, it does not identify the error. Thus, despite any 'improvement' in the order's language, it still defies the spirit of *Nicholls*.

*Nicholls* recognized that the propriety of continuing jurisdiction cannot be evaluated if the commission does not reveal, in a meaningful way, why it was exercised. In this instance, as in *Nicholls*, claimant cannot refute the allegation of error without knowing what the alleged mistake is. Saying that an error is 'real' as opposed to 'possible' is equally hollow if there is no way to test the legitimacy of the assertion." Id. at 322, 707 N.E.2d 1122.

{¶ 23} Three years later, *State ex rel. Royal v. Indus. Comm.* (2002), 95 Ohio St.3d 97, 766 N.E.2d 135, was decided. Reconsideration of Royal's permanent total disability award was granted "based on the possibility of an error in the previous Industrial Commission order." Id. at 98. The commission followed that order with a bifurcated hearing on two issues – the propriety of reconsideration and the merits of the permanent total disability claim. As to the former, the commission affirmed the grant of reconsideration, citing the existence of a mistake of law or fact. This subsequent order identified the mistakes as the staff hearing officer's (1) misrepresentation of a particular vocational report and (2) failure to consider nonmedical disability factors. Id.

{¶ 24} We rejected this belated articulation of error:

{¶ 25} "Identification of error *after* reconsideration does allow a reviewing court to adjudicate the propriety of the commission's invocation of continuing jurisdiction. It does little to help the party opposing the motion, since it comes too late to allow a meaningful challenge to reconsideration at the administrative level. Accordingly, appellants' rehabilitation theory is rejected." (Emphasis sic.) Id. at 100, 766 N.E.2d 135.

{¶ 26} The commission in Lowe's case used its continuing jurisdiction to revisit Lowe's permanent total disability eligibility based on "sufficient evidence to demonstrate that there may have been a change in circumstances sufficient to warrant the stopping of the Permanent and Total Disability award." The order

then stated that new evidence had been obtained that potentially demonstrated that Lowe was medically capable of sustained remunerative employment.

{¶ 27} Lowe focuses on the words "may have been" and argues that the use of this phrase means the commission's finding lacks the specificity demanded by *Nicholls* and its progeny. This proposition, however, elevates form over substance, while ignoring the larger purpose of *Nicholls*, *Foster,* and *Royal*. The point of those cases was not to ensure that certain words were either used or avoided. It was to ensure that litigants and reviewing courts would know why continuing jurisdiction/reconsideration had been exercised.

{¶ 28} Lowe cannot credibly allege that the presence of the words "may have been" confused him as to why continuing jurisdiction was being exercised. The January 3, 2006 order clearly stated that allegations of new and changed circumstances related to Lowe's ability to do sustained remunerative work. Moreover, the employer's continuing jurisdiction/termination motion included Dr. Bacevich's October 5, 2005 report as well as a memorandum that outlined the surveillance evidence and the employer's legal argument. Lowe knew in a timely manner exactly why continuing jurisdiction was being sought and invoked.

{¶ 29} Accordingly, the commission's decision to exercise continuing jurisdiction over Lowe's permanent total disability eligibility was not an abuse of discretion.

### Permanent Total Disability

{¶ 30} Permanent total disability compensation cannot be paid when there is evidence of (1) actual sustained remunerative employment, (2) a physical ability to do sustained remunerative employment, or (3) activities so medically inconsistent with the claimed disability as to impeach the medical evidence underlying the award. *State ex rel. Lawson v. Mondie Forge,* 104 Ohio St.3d 39, 2004-Ohio-6086, 817 N.E.2d 880, ¶ 16. At issue are the second and third elements.

{¶ 31} The staff hearing officer's September 5, 2006 order is painstakingly thorough. It reaffirmed the existence of new and changed circumstances. It stressed that permanent total disability was established, in large part, on Lowe's testimony at hearing. At that time, Lowe stated that his shoulder pain was so severe that not only did it affect his ability to concentrate, but also affected his ability to walk. He stated that he could not "take care of his activities of daily living" and needed "help from his wife in dressing and feeding."

{¶ 32} Against this background, a different staff hearing officer, three years later, stated:

{¶ 33} "[T]he activities recorded on 06/25/2005 are the most compelling. The videotape * * * shows the injured worker using both arms and hands to trim bushes using hedge clippers. The videotape on that date also shows the injured worker using both hands and arms to hold a rake which he is rapidly and forcefully moving back and forth to remove debris from the tops of bushes.

{¶ 34} " * * *

{¶ 35} "The Staff Hearing Officer finds that the videotape evidence clearly demonstrates that the allowed conditions in this claim would not so severely restrict the injured worker's functional capacity as to limit his abilities to participate in the activities of daily living or to prevent the injured worker from performing the activities of dressing and feeding. The Staff Hearing Officer finds that the [previous] Staff Hearing Officer relied upon the injured worker's testimony that he was not able to perform the activities of daily living, including dressing and feeding and that he had a limited ability to walk due to pain[,] in finding that the injured worker was permanently and totally disabled. Th[is] Staff Hearing Officer finds that the videotape demonstrates that the injured worker's condition has changed since the original Permanent and Total Disability hearing and that the injured worker has greater functional capacities than he testified to at the original hearing."

**{¶ 36}** The staff hearing officer reviewed the new reports of Drs. Bacevich and Freeman. Both doctors reached the same conclusion – Lowe was, at a minimum, physically capable of sustained sedentary work. The staff hearing officer, however, properly recognized that a capacity for sedentary work is irrelevant if Lowe would be foreclosed from such employment by nonmedical disability factors such as age, education, work history, and skill level. *State ex rel. Stephenson v. Indus. Comm.* (1987), 31 Ohio St.3d 167, 170, 31 OBR 369, 509 N.E.2d 946. The staff hearing officer performed a detailed nonmedical analysis and concluded that Lowe's nonmedical profile did not disqualify him from sedentary employment.

**{¶ 37}** Lowe contends that the Freeman and Bacevich opinions are fatally flawed because they are based on only two days of surveillance. Relying heavily on *Lawson,* 104 Ohio St.3d 39, 2004-Ohio-6086, 817 N.E.2d 880, he argues that even if the video had demonstrated that he had a capacity for remunerative employment on those days, it did not establish his ability to work on a *sustained* basis and could not form the basis for either doctor's opinion. This argument fails.

**{¶ 38}** Lowe's argument ignores a critical distinction between the evidence in this case and in *Lawson.* In *Lawson,* the commission had terminated permanent total disability based on the medical report of Dr. Dunkin. 104 Ohio St.3d 39, 2004-Ohio-6086, 817 N.E.2d 880, ¶ 8. Dr. Dunkin reviewed surveillance evidence of Lawson's activities, but did not do a medical examination. Id. at ¶ 28. The doctor had determined that Lawson was not permanently and totally disabled based solely on his evidentiary review. This conclusion, in and of itself, was not problematic. It became problematic, however, when the commission concluded that the surveillance evidence revealed no activities that were medically inconsistent with the medical evidence that was relied on to support the initial award of permanent total disability compensation.

This conclusion, in turn, effectively invalidated Dr. Dunkin's report, because when the surveillance evidence was discredited, the report was left without foundation. Id. at ¶ 28-29, 33. This lack of foundation is why termination of compensation for permanent total disability could not be upheld in *Lawson*.

{¶ 39} The medical evidence in this case is different. Dr. Freeman did not simply view the videotape. *He personally examined Lowe,* and based upon that exam, determined that Lowe was capable of sustained sedentary employment. Thus, even if the surveillance evidence had been discredited — which in this case it was not — Dr. Freeman's opinion was independently sustained by his own examination findings. In other words, the surveillance evidence is irrelevant to the viability of Freeman's report.

{¶ 40} The medical reports in this case, combined with the video and the commission's nonmedical analysis, are "some evidence" supporting the commission's decision.

{¶ 41} The judgment of the court of appeals is affirmed.

Judgment affirmed.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

_____

Weisser & Wolf and Mark B. Weisser, for appellant.

Dinsmore & Shohl, L.L.P., and Gary E. Becker, for appellee Cincinnati, Inc.

Richard Cordray, Attorney General, and Rema A. Ina, Assistant Attorney General, for appellee Industrial Commission.

_____